[No. S050851. June 15, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST EDWARD DYKES, JR., Defendant and Appellant.

732

## Counsel

Karen L. Landau, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias, Eric D. Share and René A. Chacón, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—Defendant Ernest Edward Dykes, Jr., appeals from a judgment of the Alameda County Superior Court imposing a sentence of death following his conviction of the first degree murder of Lance Clark (Pen. Code, § 187, subd. (a)),[1] one count of attempted murder (§§ 664, 189), and one count of robbery (§ 211), both involving Bernice Clark. In connection with each count, the jury found true an allegation that defendant personally used a firearm. (§ 12022.5.) With respect to the charge of attempted murder, the jury found not true an allegation that the attempted murder had been willful, deliberate, and premeditated. (§§ 189, 664, subd. (a).) In connection with the attempted murder and robbery counts, the jury found true the allegations that the victim suffered great bodily injury and that she was a victim age 70 years or older. (§ 12022.7, subd. (c).) The jury found true a robbery-murder special-circumstance allegation. (§ 190.2, subd. (a)(17)(A).) At the penalty phase of the trial the jury determined that the punishment should be death. The trial court imposed a sentence of death and imposed sentence on the noncapital offenses. Defendant's appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase Evidence*

Bernice Clark owned an apartment building in Oakland. During a period of unemployment, defendant, who was 20 years of age, resided for several months with his mother in one of the apartments in Bernice's building. The apartment defendant shared with his mother overlooked the rear parking lot of the building.

Tenants, including defendant, were aware that Bernice carried ample cash with her on her frequent visits to the apartment building. On her visits, Bernice cashed checks for tenants and lent them money; she had cashed a check for defendant. Indeed, another tenant, LaCondra Douglas, had warned Bernice not to carry cash with her. Douglas testified that defendant had expressed an intent to rob Bernice prior to the commission of the charged crimes. Tenants testified that they had observed Lance Clark, the murder victim, who was Bernice's young grandson, accompanying Bernice on her rounds on multiple occasions.

In November 1992, defendant acquired a .45-caliber revolver. Bianca Rodriguez, then his girlfriend, testified that at his request she gave him the

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

money with which to purchase the weapon. Douglas testified that about two months prior to the commission of the charged crimes, she sold defendant approximately 20 bullets for his handgun.

On the afternoon of July 26, 1993, Bernice, who was then 70 years of age, and her grandson Lance, then nine years of age, drove to the rear parking lot of the apartment building, where she consulted with her handyman. Bernice testified that she was approached by one of her tenants, Edward Tyson, who asked to borrow $20. She agreed, and while he was signing a receipt, a man approached wearing a stocking mask. The man placed a dark object against her head. She recognized the man as defendant and told him that he looked like one of her tenants. She heard a shot, then defendant said something about money or a holdup, and she recalled a struggle over her wallet. She heard only one shot, but her recollection of the crime was confused, and she was unable to hear well after the weapon discharged.

Tyson testified that on the afternoon of July 26, 1993, Bernice agreed to lend him $20. He heard her drive to the rear parking lot and approached her as she sat in the driver's seat with the door open. Tyson observed Lance seated in the passenger seat of the vehicle. As Tyson signed a receipt, a man approached wearing a light-colored hooded sweatshirt. He had a woman's nylon stocking over his head. The man demanded money of Tyson, but Tyson backed away and denied he had any. Tyson witnessed the man point his weapon at Bernice and demand money. Tyson heard Bernice inform the man that he resembled one of her tenants named Ernest. Tyson fled, and as he passed a gap in the fence he heard a firearm "dry fire." He subsequently heard two shots in quick succession, the first followed by a sound of breaking glass. After an interval he heard a third shot. He heard the robber continue to demand money after the first shot.

Alphonso Odom, who had been staying for several months with a resident of the apartment building located next to the one owned by Bernice, testified that he was acquainted with defendant and with Bernice. Odom observed defendant in front of the apartment building a few minutes prior to the shooting. Defendant was wearing a gray hooded sweatshirt and green or blue acid-washed jeans. Odom observed Bernice drive with her grandson to the rear of the apartment building. Shortly thereafter, Odom heard two shots and witnessed the second shot being fired as he stood on his apartment balcony. He observed defendant standing by Bernice's vehicle holding a firearm and wearing a gray sweatshirt and green or blue acid-washed jeans. He heard the sound of breaking glass after the second shot, and observed defendant flee over the back fence.

Odom ran from his apartment to the scene of the shooting, joining Tyson, who had returned after initially fleeing. They observed Lance slumped over in

the automobile. Bernice's neck was bleeding. Lance had been shot and soon stopped breathing. Emergency medical personnel were unable to revive him.

Tyson remained at the scene, while Odom returned to his apartment. Tyson gave a statement to the police, picked defendant's photograph from a photo lineup, and reported that the robber's voice sounded like defendant's. Odom, on the other hand, did not contact the police concerning his knowledge of the crime until after he was arrested on unrelated charges a few days subsequent to the commission of the charged offenses. He hoped for leniency in return for information he was able to provide. His testimony was impeached with prior felony convictions.

Defendant changed his attire and returned to the scene of the shooting. There he spoke with a police officer, stating that he had observed Tyson speaking with Bernice as she sat in her vehicle and that as he crossed the parking lot he heard shots. An unidentified, armed Black male wearing jeans and a white hooded sweatshirt ran past him and fled over the back fence. The officer testified that defendant appeared composed and was not intoxicated. Odom overheard some of this discussion, reporting that defendant told the officer, "that's messed up. The dude ran right by me."

In the afternoon or evening of July 26, 1993, Odom lent his bicycle to defendant. When defendant returned with some beer, defendant said to Odom, "that was f'd up, you know, what happened." Odom agreed and said he knew defendant was responsible for the shooting. Odom testified that defendant admitted he was the culprit and said, "man, I didn't mean it to go down like that."

Lance was killed by a single gunshot that passed through his body from his left chest, exiting on the lower right side of his back. There was a large entry wound, indicating the same bullet had passed through Bernice's neck before it struck Lance. The forensic pathologist, Dr. Paul Hermann, was unable to determine with certainty Lance's position when he was shot, but the pathologist believed Lance had been leaning to the left. Bernice received an injury to her neck but survived.

An examination of Bernice's automobile produced a bullet lodged inside the rear door on the passenger side. The impact of the bullet had shattered the door's window. Another bullet later was discovered in the front passenger floor area.

Dr. Lansing Lee, a firearms expert, testified that the bullets discovered in Bernice's vehicle were for a .45-caliber semiautomatic pistol. Although the ammunition was manufactured for a semiautomatic weapon, it also could be

fired by a certain vintage Colt .45-caliber revolver. Such a weapon could be fired by single action if the shooter pulled back the hammer using two pounds of pressure. The weapon also could be fired without pulling back the hammer, but would require at least eight pounds of pressure to fire.

Sergeant Madarang of the Oakland Police Department was interviewing Tyson at the police station on the day of the crime when he received a telephone call from someone who would identify herself only as Connie, stating that she had sold defendant some bullets a few days preceding the crime, and that defendant had told her he planned to rob Bernice. In her own testimony, LaCondra Douglas would admit only that she had placed an anonymous call to the police on that date, denying she had reported that defendant had purchased ammunition from her.

On August 7, 1993, defendant telephoned the Oakland Police Department, stating he "want[ed] to know if I shot somebody." He mentioned Bernice and provided his location, but denied responsibility for the crime. He was arrested and transported to the police department for interrogation. Arresting officers directed him not to speak while he was being transported, but he did so in a rambling manner, wondering how he could be identified and stating he would not commit anything like the charged crimes. Once defendant arrived at the police station, he was advised of his constitutional rights and interrogated by Officers Chenault and Madarang. During two hours of questioning, he denied responsibility for the crime. He reported that he had heard the shots because he had been walking through the parking lot on his way to purchase beer, and repeated his story of having witnessed an unidentified Black male flee from the scene. Ultimately the officers confronted him with evidence in their possession, including statements of eyewitnesses. Defendant became distressed and admitted involvement in the shooting. The unrecorded statement reflected the circumstance that he was aware prior to the shooting that Lance was in the vehicle.

Defendant subsequently made two tape-recorded statements. These were played for the jury. In the first statement, he explained that his family expected more of him than he was able to deliver and that he needed money to attend Laney Community College. He observed Bernice from the rear of his apartment and decided to rob her. He approached the vehicle and demanded money. She did not respond quickly, so he unsuccessfully attempted to fire a warning shot, and on the second attempt fired a shot to the rear of the vehicle, intending to destroy the rear window. Bernice said "don't be silly, child" and told him to take the money from her wallet but leave the cards. He had one hand on the wallet and the other hand, which was holding his firearm, on the headrest of the driver's seat. During the struggle over the wallet, the weapon fired accidentally. He claimed he had not observed Lance

in the vehicle. He departed from the scene, changed his clothes, and returned to the apartment building to see what was happening. He subsequently threw the murder weapon, a .45-caliber Colt service revolver manufactured in 1917, into the Oakland Estuary. He stated he had drunk four cans of Olde English 800 malt liquor prior to committing the crime and one afterwards, but in his statement he informed the police he was not under the influence of alcohol when he committed the crime. Defendant sobbed during the recorded statements and reiterated "I didn't mean for it to go down like that. I'm no killer." He informed the officers he had spent two weeks following his commission of the crime drinking alcohol and using marijuana, feeling that his world was coming to an end. After his father notified him he had been mentioned in the newspaper as a suspect in the crime, he telephoned the police department.

Defendant testified in his own behalf at trial, giving substantially the same narrative he had given in his taped statements. He testified he had spent the afternoon preceding the crime applying for employment, and then returned home and performed household chores. When he observed Bernice drive into the rear parking lot of the building, he formed the intent to rob her. He retrieved his loaded firearm, and then took some stockings from his mother's room to wear as a mask. Donning jeans over his shorts and pulling the hood of his sweatshirt over his head to disguise himself from Bernice, he proceeded to the parking lot and confronted Bernice without ever observing Lance in her vehicle. He demanded her money. She said, "Don't be stupid, child." When she hesitated, he attempted to fire his weapon, but failed. A second attempt resulted in a warning shot aimed at the rear of the vehicle. Bernice tried to remove the cash from her wallet, but defendant grabbed the wallet.

In his trial testimony, defendant claimed for the first time that after he fired the warning shot, LaCondra Douglas's boyfriend drove into the parking lot and defendant became flustered and rushed, leading to the accidental firing of the weapon during his struggle with Bernice over her wallet. He denied intending to shoot Bernice or injure her. He seized the cash from the wallet and fled through a gap in the rear fence, wondering whether he really had shot Bernice. He changed his clothing, found a hiding place for his firearm, purchased some beer, and shortly thereafter returned to the parking lot to find out what had transpired. He lied to the police, trying to offer a description of the shooter that "somewhat" matched his own appearance, in case he had been observed during the shooting. He subsequently disposed of his weapon and spent the ensuing days in a state of intoxication, "trying to forget." He testified that he "was just doing stuff like [he] felt this was [his] last days on earth or something." After discussion with his father, he telephoned the police department to determine whether there was a warrant for his arrest. During the initial stage of his interrogation, he had denied responsibility for the crimes because he was frightened.

In the course of his testimony, defendant denied that his girlfriend had given him the money to buy the firearm and claimed that LaCondra Douglas had provided him with the ammunition free of charge, months prior to the crime. He testified he had test-fired the weapon and found its firing unpredictable. Defendant testified he had observed Lance accompanying Bernice on only one occasion. Defendant denied he had stated prior to committing the crime that he intended to rob Bernice, claiming he merely had been present when other tenants discussed robbing her. He acknowledged he was on probation for illegal possession of a firearm at the time he committed the crime and knew he should not be armed, but he claimed he needed a weapon to protect himself from the drug dealers who trafficked in his neighborhood.

### B. *Penalty Phase Evidence*

Penalty phase evidence introduced by the prosecution included testimony from Bernice, Lance's sister Kristie, and Lance's elementary school teacher. They described how they had learned of Lance's death and described the impact of his death upon them. Bernice recounted the difficult course of her recovery from her physical injuries.

Oakland Police Officer Rand Monda described the circumstances of defendant's prior illegal possession of a loaded, concealed firearm.

Defendant's mother, father, sister, brother, and aunt testified on his behalf, describing their love for him and their hope that he would be granted a sentence of life imprisonment.

## II. DISCUSSION

### A. *Asserted Errors Affecting the Guilt Phase of Trial*

#### 1. *Denial of motion to exclude statements*

Defendant claims statements he made to the police and the deputy district attorney at the police station following his arrest were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), because the police failed to honor his asserted unequivocal request for counsel. He also contends he made these statements involuntarily. Finally, he challenges as involuntary the statements he made in the police vehicle as he was being transported to the police station after his arrest. Defendant argues that the trial court's failure to suppress the statements constituted a violation of rights secured by the Fifth Amendment to the United States Constitution and requires reversal of his conviction and sentence of death.

### a. *Factual background*

At the in limine hearing on defendant's motion to exclude his statements from evidence, the parties presented starkly contrasting accounts of defendant's interactions with arresting officers Grier and Fritz, and his interviews with Sergeants Madarang and Chenault.

On August 7, 1993, defendant telephoned a police dispatcher to inquire about his potential responsibility for the charged crimes. Officer Fritz arrived to arrest him. Fritz placed defendant in his patrol car, advised him that he was under arrest on suspicion of murder, and directed him not to ask questions concerning the case. Fritz did not advise defendant of his *Miranda* rights or pose any questions. Defendant began to talk, inquiring how he had been identified and remarking that he had not been in trouble recently. Fritz then asked Officer Keller to join him in the police vehicle. Fritz again informed defendant that he should not inquire about the charges or make any statements. Defendant nonetheless continued to speak, again questioning who had identified him and inquiring, "are you sure it's me?" After approximately 10 minutes, Officer Keller exited from the vehicle and Fritz drove defendant to the police station, arriving at approximately 10:00 a.m.

Defendant was placed in an interview room and was offered food, drink, and cigarettes. Sergeant Madarang, the primary investigating officer, was at that time in Sacramento. He returned to Oakland, entering the interrogation room with his partner, Sergeant Chenault, at approximately 12:20 p.m. He asked defendant some preliminary questions. Sergeant Madarang then read defendant the full *Miranda* advisements directly from a printed form, which defendant initialed. Defendant agreed to speak with the officers. Over the next hour and a half, he denied any responsibility for the shooting and claimed to have been merely a witness. At approximately 2:00 p.m., the officers took a break, offering defendant refreshment and a bathroom break. They returned for further interrogation at approximately 3:30 p.m. Defendant continued for approximately an hour to deny guilt. The detectives informed defendant that witnesses had identified him as the shooter, and challenged him with the evidence they had gathered against him. Defendant became emotional and stated he wished to explain what really happened. At approximately 4:45 p.m., defendant confessed to the crime, explaining he decided to rob the victim because he was under financial pressure from his family.

Sergeant Madarang subsequently initiated a tape-recorded interview in which defendant again confessed. Defendant acknowledged he had been advised of his rights when the officers first arrived to question him. Sergeant Madarang again read the *Miranda* advisements to defendant. After confirming that his initials were on the *Miranda* form, defendant stated he understood his

rights and wished to speak with the detectives. At the end of the tape-recorded interview, defendant confirmed he was not promised anything or threatened in any way.

After the tape-recorded interview with Sergeant Madarang, defendant participated in another tape-recorded interview with Deputy District Attorney O'Connor, again confessing to the murder. At the beginning of this second interview, defendant confirmed that he already had spoken to the officers, that he had done so freely and voluntarily, and that the officers had read the *Miranda* advisements to him. After the deputy district attorney again read defendant the *Miranda* advisements, defendant initialed a second *Miranda* form and stated he understood his rights and, having those rights in mind, wanted to speak.

Defendant testified at the hearing that he had telephoned the police because he had read a newspaper article about the shooting. According to defendant, he made no requests for action on the part of the police department, but was informed an investigator would arrive to speak with him. He was placed in the patrol car. He inquired whether the officers had a warrant, but said nothing else. After his arrest he waited two to three hours in a small room at the police station before being interviewed by the officers.

Defendant claimed that when the officers began to interrogate him, they failed to advise him of his rights. He claimed he requested counsel, but was informed "there isn't one right now, but we'll get one for you," and the interrogation continued. According to defendant, the officers accused him of committing the murder, stated he could not make a statement later if he waited for a lawyer, threatened him with not seeing his girlfriend unless he told the truth, and informed him the matter was not sufficiently serious to warrant a judgment of death. Defendant testified the police informed him that a truthful confession would be beneficial to him and result in imprisonment only for a few years, and advised him that if he did not tell the truth then, his statement would constitute damaging evidence when he was brought before a court and at trial. According to defendant, he again requested counsel and to telephone his parents. Defendant testified he confessed only after the officers ignored his requests for counsel, asserted that they had witnesses against him, stated that he would have no opportunity to make a statement later, and patted him on the shoulder urging him to confess. On cross-examination, defendant acknowledged that he had been offered food and drink throughout the interviews, that he had been advised of his constitutional rights in past unrelated matters, that he knew he could speak with a lawyer, and that on prior occasions he had been arrested and had refused to talk to the police.

Sergeants Madarang and Chenault testified that defendant did not request to speak with an attorney during their interrogations. They denied defendant's

other assertions. The officers denied threatening or making promises to defendant to persuade him to confess. They denied having discussed the death penalty or offered benefits in exchange for the confession. The officers did not say it would "make a difference" to the court or the prosecution if defendant told the truth. They did not threaten defendant that he would not see his parents or girlfriend unless he confessed, nor did they inform him that if he confessed he would be subject to imprisonment for only a few years. Sergeant Madarang denied patting defendant on the shoulder. Madarang testified that throughout the interviews, the officers provided defendant with soft drinks and with cigarettes at his request, allowed him to use the restroom, and offered him food.

In argument on the motion, the prosecutor stressed defendant's written and recorded acknowledgements that he had been advised of his rights in a timely manner. Defense counsel did not seriously contest the *Miranda* issue, stating in response to the prosecutor's argument: "I think the issue is not whether or not he was properly admonished. I believe that the timing—you know, I see no reason to disbelieve, frankly, the time of that." Instead, defense counsel argued: "The issue is whether or not he was told it was a capital offense, whether he was told things would be better for him."

The trial court denied the motion to suppress and admitted defendant's statements, accepting the officers' version of the events as true and concluding that defendant properly was advised of and waived his *Miranda* rights. The court made a finding that Sergeants Madarang and Chenault were credible witnesses, based on "the content of their testimony" and the court's "personal observations of their demeanor as they testified." The court concluded it was established beyond a reasonable doubt that defendant had received timely admonitions and knowingly and intelligently had waived his rights. The court further found, beyond a reasonable doubt, that defendant's statements "were freely and voluntarily given." Specifically, the trial court concluded "that there [were] no circumstances of coercion or force, and that the totality of the circumstances indicate[d] that these statements were voluntarily given." With respect to the statements made to the deputy district attorney, the trial court reached the same conclusions, finding beyond a reasonable doubt that defendant was "appropriately and in a timely fashion advised . . . of his constitutional rights, and . . . freely and voluntarily waived those rights."

b. *Defendant's challenge to the admissibility of his confessions*

Defendant asserts his initial confession to Sergeants Madarang and Chenault was obtained in violation of *Miranda* because it was elicited from

him after his unequivocal request for counsel. Defendant also asserts his second confession to Deputy District Attorney O'Connor was the tainted product of his initial confession. We conclude the trial court properly denied defendant's motion to suppress these two confessions.

■ Pursuant to *Miranda, supra*, 384 U.S. 436, "a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519]; see also *People v. Rundle* (2008) 43 Cal.4th 76, 114 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) After a knowing and voluntary waiver, interrogation may proceed " 'until and unless the suspect clearly requests an attorney.' " (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1124 [23 Cal.Rptr.3d 295, 104 P.3d 98].) The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1034 [60 Cal.Rptr.2d 225, 929 P.2d 544], citing *Colorado v. Connelly* (1986) 479 U.S. 157, 168 [93 L.Ed.2d 473, 107 S.Ct. 515].)

In considering a claim on appeal that a statement or confession is inadmissible because it was obtained in violation of a defendant's *Miranda* rights, we "review independently the trial court's legal determinations . . . . We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and ' "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." ' " (*People v. Rundle, supra*, 43 Cal.4th at p. 115.)

The trial court in the present case was aware that the prosecution's burden was to establish the validity of defendant's waiver by a preponderance of the evidence but, apparently to demonstrate its confidence in its conclusion, applied the stricter beyond a reasonable doubt standard. The court stressed that it credited the officers who testified that defendant was advised of his *Miranda* rights in a timely manner and that he never requested counsel. The two tape-recorded interviews, the first with the officers and the second with the deputy district attorney, further corroborate the officers' version of the events. In the tape-recorded interviews, defendant acknowledged that he had been advised of his rights at the commencement of the prior interrogation, that he initialed the waiver form, and that he wished to speak to the authorities. We accept the trial court's resolution of the factual dispute that existed between the defense and the prosecution witnesses, along with its credibility determination, because both findings were amply supported by the evidence.

Defendant's attack on the credibility of all of the police officers, unsupported by the record of the suppression hearing, is insufficient to provide a basis for rejecting the trial court's findings. Defendant urges that the very comprehensiveness of the officers' denials that they urged defendant to confess undermines the officers' credibility. We are persuaded, however, that the trial court's determination that the officers were credible witnesses is supported by substantial evidence. In sum, defendant's *Miranda* claim lacks merit. Having concluded that defendant's initial confession to the officers was not obtained in violation of *Miranda*, we reject defendant's related claim that his second confession to the deputy district attorney was the tainted product of his initial confession.

■ Defendant also challenges the admission of the statements on the ground they were involuntary. Any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible pursuant to the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution. (*People v. Sapp* (2003) 31 Cal.4th 240, 267 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Neal* (2003) 31 Cal.4th 63, 67 [1 Cal.Rptr.3d 650, 72 P.3d 280].) To determine the voluntariness of a confession, courts examine " 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." (*Dickerson v. United States* (2000) 530 U.S. 428, 434 [147 L.Ed.2d 405, 120 S.Ct. 2326].) In making this determination, courts apply a "totality of the circumstances" test, looking at the nature of the interrogation and the circumstances relating to the particular defendant. (*People v. Haley* (2004) 34 Cal.4th 283, 298 [17 Cal.Rptr.3d 877, 96 P.3d 170]; *People v. Massie* (1998) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].) With respect to the interrogation, among the factors to be considered are " ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" . . . .' " (*People v. Massie, supra*, 19 Cal.4th at p. 576.) With respect to the defendant, the relevant factors are " ' "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*Ibid.*) "A statement is involuntary [citation] when, among other circumstances, it 'was " 'extracted by any sort of threats . . . , [or] obtained by any direct or implied promises . . . .' " ' " (*People v. Neal, supra*, 31 Cal.4th at p. 79.)

As with *Miranda* claims, the trial court's legal conclusion as to the voluntariness of a confession is subject to independent review on appeal. (*People v. Haley, supra*, 34 Cal.4th at p. 298; *People v. Massie, supra*, 19 Cal.4th at p. 576.) The trial court's resolution of disputed facts and inferences, its evaluation of credibility, and its findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence. (*People v. Haley, supra*, 34 Cal.4th at p. 298; *People v. Massie, supra*, 19

Cal.4th at p. 576.) The state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence. (*People v. Haley, supra,* 34 Cal.4th at p. 298.)

In the present case, again applying the beyond a reasonable doubt standard, the trial court concluded that "there [were] no circumstances of coercion or force, and that the totality of the circumstances indicates that these statements were voluntarily given." The interrogating officers specifically denied defendant's claims, including that they offered him benefits for confessing, issued threats, or misled him concerning the potential punishment he faced. The trial court credited the officers' testimony, and its credibility determination is supported by substantial evidence.

Under all the circumstances, we agree with the trial court that defendant's statements were made voluntarily. Although defendant was required to wait approximately two hours before the interrogation began, the delay was not the result of improper police conduct. Rather, it arose because the police had not planned to arrest or interview defendant prior to his own telephone call to the police; Sergeant Madarang, the lead investigator, was in Sacramento and was required to travel to Oakland to interview defendant. During defendant's interrogation, the officers provided defendant with soft drinks and cigarettes, allowed him to use the restroom, and offered him food. Most important, as the trial court found, the officers did not engage in any impermissibly coercive tactics in procuring defendant's confession.

Defendant contends his own unbalanced mental state rendered him susceptible to coercion. His claim that he was mentally disturbed is based primarily upon the circumstance that he telephoned the police dispatcher and that he spoke in a rambling manner in the police vehicle while being transported to the police station. This conduct, however, may be explained by the stress and emotion felt by defendant after recognizing that he would face responsibility for the crime. In any event, his own vulnerability does not demonstrate official coercion. "Insofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion, this court has noted that '[t]he Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources *other than official coercion.*" ' " (*People v. Smith* (2007) 40 Cal.4th 483, 502 [54 Cal.Rptr.3d 245, 150 P.3d 1224], italics added.) Although defendant may have felt vulnerable, there is no indication of police coercion during his initial contacts with the police or during the subsequent interrogations. Similarly, although defendant claims his decision to confess was based upon his youth and his absence of experience with the criminal justice system, there was no indication of police exploitation of these circumstances. On the contrary, during his tape-recorded interviews, defendant expressly stated that he was speaking freely and voluntarily.

Consequently, the trial court properly concluded that defendant's confession was made voluntarily.

### c. Defendant's challenge to statements he made in the patrol car

Defendant contends his spontaneous statements made en route to the police station on August 7, 1993, were similarly involuntary because he was mentally disturbed at the time he made the statements.

In response to an ambiguous challenge to the voluntariness of statements defendant made in Officer Fritz's patrol vehicle, the trial court found that these statements "were freely and voluntarily given." In addition, according to the trial court, although defendant was not given *Miranda* advisements, his statements were made spontaneously and "were not the product of custodial interrogation." Accordingly, the trial court concluded that these spontaneous statements were admissible. The trial court also stated that based upon its personal observation of Officer Fritz as he testified, it found that the officer was "a believable and credible witness."

Defendant again contends his unbalanced mental state is evidenced by his conduct in contacting the police and in his repetitive and rambling statements made while he was seated in Officer Fritz's patrol car. Fritz did not describe defendant's statements as rambling or incoherent. Defendant himself testified that he said nothing at all in the patrol car, whether rambling or otherwise, other than to inquire whether the officers had a warrant. Fritz credibly testified that he did nothing more than sit and listen to defendant. There is no evidence of any official coercion or of exploitation of defendant's youth or asserted inexperience. Defendant's claimed psychological vulnerabilities do not suggest his statements were involuntary. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1403 [58 Cal.Rptr.3d 368, 157 P.3d 973]; *People v. Smith, supra,* 40 Cal.4th at p. 502.) Accordingly, we conclude that the trial court properly denied defendant's motion to suppress the statements defendant made in the police car.

### 2. Prior consistent statements

Defendant contends that the trial court erred by permitting the prosecutor to enhance the credibility of prosecution witness Alphonso Odom through the admission of Odom's prior consistent statements. Defendant claims in essence that these prior out-of-court statements constituted hearsay and were not made admissible by Evidence Code section 791, subdivision (b). In pertinent part, that provision limits the admission of a prior out-of-court statement to circumstances in which there has been an express or implied

charge that the witness is fabricating or is influenced by bias or other improper motive, and the statement was made before any potential bias or motive to lie arose. Defendant points out that the defense had not yet impeached Odom when the statements were admitted, and he claims that, in any event, Odom already had a motive to fabricate when he made the prior statements.

This claim arises in the following factual setting. At trial, Odom recounted his observations on the day the crimes were committed. He testified he was present at his home that afternoon. He resided in the apartment building next to the building in which defendant resided. He observed defendant, wearing distinctive clothing, standing near the mailbox area of his own apartment building. From the vantage point of his apartment balcony, Odom observed defendant proceed down the driveway toward the back of the building and the parking lot where the murder occurred. Returning to the interior of the apartment, Odom heard a shot. He ran to the balcony and witnessed the shooting that resulted in Lance's death. Odom hurried to the scene and attempted to provide assistance to Lance until he realized that the boy was dead. Odom returned to his home as the police approached. Odom observed defendant return to the scene and "act surprised" during defendant's discussion with the responding officers. Later that day, Odom made it known to defendant that he, Odom, realized defendant was the perpetrator of the crime. Defendant responded "it wasn't supposed to go down that way."

During his trial testimony, Odom experienced some difficulty recalling the precise course of events, explaining that the years intervening between the crimes and the trial rendered precise recollection difficult. He was uncertain whether he had seen defendant at the mailboxes on one or two occasions, that is, whether he had returned to his apartment during defendant's visit to the mailboxes. During his testimony, initially he recalled having heard only one shot, but later, with the assistance of his prior statements to refresh his recollection, reported having heard two shots. Odom was uncertain of the precise words employed by defendant in making the foregoing admission.

Defendant complains of three occasions on which the prosecutor displayed to Odom his prior statement to the police, his preliminary hearing testimony, or notes from a photographic lineup, thereafter requesting that Odom ratify the prior statements.

In the first example, Odom testified that the person he observed at the door of Bernice's automobile with a gun in hand was wearing the same clothing he had observed defendant wearing just before the gunshots sounded. During further direct examination on the following day of trial, in the context of identifying the shooter, Odom testified, "I didn't see a face, I just seen the

same clothing." The prosecutor then read Odom's preliminary hearing testimony, as follows: "Q: Was there any question in your mind that was [defendant] you saw? [¶] A: No, there was no question in my mind, because I had just seen him in that clothing." Odom confirmed he had given that answer at the prior hearing, adding "Like I said I seen him in that clothing." The prosecutor essentially repeated the question and received the same answer. Ultimately the prosecutor inquired: "Is it your testimony now that you have no question as you sit there now that it was the defendant . . . that you saw at the door of the car? [¶] A: Yes. [¶] [Q:] You do or do not have? [¶] A: I mean, yes, it was Ernest Dykes."

In the second example, Odom testified concerning his encounter with defendant on the day of the crime when defendant admitted his culpability. Odom recalled at trial that defendant said something to the effect "it wasn't supposed to go down like that," but Odom apologized, expressing some uncertainty regarding the exact wording of this admission. The prosecutor responded: "Well, no need to apologize. And you testified yesterday that [defendant] told you that he did this, is that correct?" The examination continued: "[¶] A: Yes. [¶] Q: When you picked the photograph out, photograph number two, on August 10th, you picked that photograph as being the person who told you they did it, is that correct? [¶] A: Come again? I didn't . . . . [¶] Q: When you picked [defendant's] photograph out of the group of photographs, you picked his photograph as being the person who told you he did it, is that correct? [¶] A: Yes. Yes. [¶] Q: So in other words you were saying the same thing at that time as you said here in court yesterday? [¶] A: Yes."

The final example occurred when Odom testified that defendant told him he took the money he stole from Bernice Clark and his weapon to a girlfriend's residence after the crime. According to Odom's testimony, defendant commented that he had stolen "about a hundred bucks." Odom was uncertain of defendant's exact words. In response to a question posed by the prosecutor, Odom verified that in his statement to the police and when he testified under oath at the preliminary hearing, he stated that Dykes told him he "got about a hundred bucks."

Defendant concedes that his attorney did not interpose timely objections to the questions on the ground asserted on appeal. As defendant also acknowledges, numerous decisions by this court have established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 433–435 [35 Cal.Rptr.3d 644, 122 P.3d 765]; *People v. Lewis* (2001) 26 Cal.4th 334, 357 [110 Cal.Rptr.2d 272, 28 P.3d 34].) Defendant asserts that the forfeiture rule should not apply,

because there is a "heightened need for reliability and fairness in a capital case." This court, however, has rejected the claim that the forfeiture rule does not apply in capital cases. (*People v. Benavides* (2005) 35 Cal.4th 69, 115 [24 Cal.Rptr.3d 507, 105 P.3d 1099] [rejecting a claim that we should conduct " 'plain error review' " notwithstanding forfeiture in capital cases]; *People v. Cain* (1995) 10 Cal.4th 1, 28 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Defendant fails to establish the existence of any "structural defect" such as was identified by the high court in *Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310 [113 L.Ed.2d 302, 111 S.Ct. 1246], that would lead us to overlook our forfeiture doctrine.

Defendant adds that, even if the evidentiary claim was forfeited, the underlying claim should be reached on the theory that the prosecutor committed misconduct in conducting the examination of Odom, rendering the trial fundamentally unfair. But trial counsel's failure to object in a timely manner to asserted prosecutorial misconduct also results in the forfeiture of the claim on appeal. (*People v. Stanley* (2006) 39 Cal.4th 913, 952 [47 Cal.Rptr.3d 420, 140 P.3d 736].) Contrary to defendant's assertion, even if we assume there was merit to the claim, a timely objection and a request for admonition would not have been futile.

■ In any event, defendant's claims are not meritorious. Defendant assumes that the sole possible basis for the admission of Odom's prior statements was Evidence Code section 791, subdivision (b), but that the evidence did not meet the requirements of that provision. This statute permits the admission of a prior consistent out-of-court statement when there has been a charge that the testimony at the hearing has been fabricated or "influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).) Defendant claims that the prior consistent statements were elicited before there had been any attempt to impeach Odom, and *after* Odom already had developed a motive to fabricate. He asserts that Odom's motive to fabricate—the desire to be released from jail—arose before he contacted the police to offer assistance in their investigation.

■ Even if Odom's out-of-court statements were not admissible because they were not made "before the bias, motive for fabrication, or other improper motive is alleged to have arisen" (Evid. Code, § 791, subd. (b)), if defendant had interposed hearsay objections to the introduction of the prior statements, the prosecutor might have been able to demonstrate that at least the first two statements were admissible as examples of prior identification

pursuant to Evidence Code section 1238.[2] As the Law Revision Commission comment to that provision explains: "Under Section 1238, evidence of a prior identification is admissible if the witness admits the prior identification and vouches for its accuracy." (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1238, p. 249; see *People v. Gould* (1960) 54 Cal.2d 621, 626 [7 Cal.Rptr. 273, 354 P.2d 865] ["Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached [citations], evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value . . . ."], overruled on other grounds in *People v. Cuevas* (1995) 12 Cal.4th 252, 263 [48 Cal.Rptr.2d 135, 906 P.2d 1290]; see also *People v. Boyer* (2006) 38 Cal.4th 412, 480 [42 Cal.Rptr.3d 677, 133 P.3d 581]; 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 163, pp. 876–877.)[3]

■ The prosecutor also might have been able to secure the admission of all three of the statements on the ground that the witness had been forgetful and evasive during his testimony, rendering prior statements admissible for their truth as prior recorded recollections pursuant to Evidence Code sections 1235 and 770. Discussing the two provisions, we explained that "[t]hose statutes . . . provide for the admission against a hearsay challenge of a prior statement by a witness 'if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770.' [Citation.] Under Evidence Code section 770, prior inconsistent statements are admissible only if: '(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action.' " (*People v. Sapp, supra,* 31 Cal.4th at p. 296.) Under certain circumstances, testimony may be considered inconsistent with prior statements when it reflects absence of recollection or evasiveness. (See *People v. Green* (1971) 3 Cal.3d 981, 987–988 [92 Cal.Rptr. 494, 479 P.2d 998]; see also *People v. Sapp, supra,* 31 Cal.4th at p. 297.)

---

[2] Evidence Code, section 1238 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying and: [¶] (a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence; [¶] (b) The statement was made at a time when the crime or other occurrence was fresh in the witness' memory; and [¶] (c) The evidence of the statement is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time."

[3] Other elements required under this hearsay exception also appear to be present, in that defense counsel stipulated that the written statements accurately reflected what the witness had said on the prior occasions, and Odom's statements to the police and the selections he made at the photo lineup occurred less than two weeks following the commission of the crime.

We need not speculate whether, in response to defense objections, the prosecutor could have established the proper foundation for admissibility of each of Odom's prior out-of-court statements under these provisions, because it is clear that admission of the statements was harmless. Defendant admitted in his recorded confessions and in his trial testimony that he robbed Bernice and was responsible for the shot that injured her and killed Lance. Prosecution witness Edward Tyson, along with the surviving victim, Bernice, also provided detailed eyewitness testimony. Defendant himself testified that he demanded money from Bernice, and his claim that he did not recall the exact amount was impeached by his prior inconsistent statement to the police at the time of his arrest that he had garnered exactly $142.

Defendant counters that prejudice occurred because Odom's credibility was essential to the prosecution's case. According to defendant, Odom's credibility was important not only because Odom testified that defendant admitted committing the crimes and assertedly provided details that were not available from other witnesses, but also because Odom's testimony provided a significant basis for the charge of premeditated murder and premeditated attempted murder. Defendant claims this was because Odom testified he observed defendant standing near the apartment building mailbox shortly before the first shot rang out—testimony assertedly giving rise to an inference that defendant planned the crime in advance "and that he was waiting for Mrs. Clark to arrive in order to commit the crime." But defendant himself testified that he decided up to one-half hour in advance of the crime to rob Bernice and also decided on that occasion to arm himself with a loaded firearm, even though his purpose was to confront an elderly woman who was known to lend money freely. It added little to the proof of premeditation for Odom to suggest that defendant had been standing outside the apartment building shortly before committing the crime.

Moreover, to the extent defendant's claim is based upon the argument that the jury would infer that critical portions of Odom's trial testimony were true because Odom had made prior statements that were consistent with his trial testimony on other points, the contention lacks merit. The same inference could be gleaned through many *other* instances in which the prosecutor referred to Odom's prior consistent statements. The prosecutor repeatedly referred to Odom's prior statements and testimony during his direct examination of Odom, and no objection was forthcoming at trial (or, for that matter, on appeal).[4]

---

[4] As noted in connection with defendant's claim that we should overlook defense counsel's failure to object at trial to the admission of the evidence, defendant has not identified any "structural error" that would require reversal in the absence of a showing of prejudice. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1160 [32 Cal.Rptr.3d 759, 117 P.3d 476].)

### 3. *Prosecutorial misconduct*

Defendant contends the prosecutor committed prejudicial misconduct on a number of occasions during the guilt phase of the trial. He claims a violation of his right to a fair trial under the Fifth and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution.

■ We review claims of prosecutorial misconduct pursuant to a settled standard. "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 298 [79 Cal.Rptr.3d 648, 187 P.3d 363]; see *People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) In addition, " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion— and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " (*People v. Stanley, supra*, 39 Cal.4th at p. 952.) Objection may be excused if it would have been futile or an admonition would not have cured the harm. (See *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

■ In considering defendant's claims, we recall the limited issues that were in dispute in the present case. In view of defendant's testimony and his confessions, defense counsel admitted in his argument to the jury that defendant had fired the shot that injured Bernice Clark, and that he had committed a robbery and a robbery murder. Defense counsel disputed that defendant intended to kill Bernice. Counsel also urged the jury to conclude that because Lance's killing assertedly was accidental and occurred while defendant was attempting to disengage from Bernice in their struggle over her wallet, the killing was not committed to "advance" the felony within the meaning of the robbery-murder special-circumstance allegation. Although the point is not critical to the discussion of the present issue, to avoid confusion we note that there is no requirement that the prosecution prove an additional

or different element that the killing be committed to "advance" the felony. (*People v. Horning* (2004) 34 Cal.4th 871, 907–908 [22 Cal.Rptr.3d 305, 102 P.3d 228].)[5]

### a. *Opening statement*

Defendant contends the prosecutor's opening statement was argumentative, unsupported by the record, and constituted an appeal to passion and prejudice. He refers to the following comments: "You know, there's three ways to get money. You can earn it, you can borrow it, or you can steal it, and [defendant] chose to steal it at gunpoint from a senior citizen in the company of a nine-year-old child and a dog. [¶] After you hear all the evidence from the technician and two criminalists you will be convinced that the same bullet that passed through Mrs. Clark's neck then passed through her grandson's body and killed him. And he died looking at her, and she had to sit there next to him in the car. I think it probably goes without saying that that sort of experience almost defies description."

There was no objection and the claim is forfeited. (*People v. Prince* (2007) 40 Cal.4th 1179, 1275 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

In any event, the claim lacks merit. With one possible exception, the statement was closely tied to the evidence presented by the prosecutor. Respondent acknowledges that the evidence may not have established that the victim died looking at his grandmother, but there was evidence that could support the view that the child was leaning toward his grandmother when he

---

[5] As we have explained, "[t]he felony-murder special circumstance applies to a murder committed while the defendant was engaged in, or was an accomplice in the commission of, the attempted commission of, or the immediate flight after committing or attempting to commit, various enumerated felonies . . . . [Citation.] A strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the defendant intended to commit the felony at the time he killed the victim and that the killing and the felony were part of one continuous transaction." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 87 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Relying upon *People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468], we have explained that the felony-murder special circumstance was intended to apply to those who "killed 'to advance an independent felonious purpose,' " but was not intended to apply when the felony was " 'merely incidental to the murder . . . .' " (*People v. Horning, supra,* 34 Cal.4th at p. 907, and cases cited.) The pattern jury instruction reflects the so-called *Green* rule. (CALJIC No. 8.81.17 [proof is required that "[t]he murder was committed in order to carry out or advance the commission of the crime . . . . In other words, the special circumstance referred to in these instructions is not established if the [crime] was merely incidental to the commission of the murder."].) The "carry out or advance" language found in the pattern instruction is based upon our cases and constitutes merely another way of describing the *Green* rule—that a felony murder is not established by proof of a felony that was merely incidental to a murder. (*People v. Horning, supra,* 34 Cal.4th at pp. 907–908; *People v. Navarette* (2003) 30 Cal.4th 458, 505 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)

was shot. As we have commented, "remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted." ' " (*People v. Wrest* (1992) 3 Cal.4th 1088, 1108 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) In the present case, the jury was instructed that the prosecutor's opening statement did not constitute evidence. As we have declared in a comparable case, "[a]ny inconsistency between the opening statement and the evidence was inconsequential. [Defendant] was permitted to confront all witnesses and to challenge and rebut all evidence offered against him. Under these circumstances, [defendant] suffered no conceivable prejudice." (*Id.* at pp. 1109–1110.)

Defendant contends that the quoted language describing him in an unflattering and critical light was argumentative and constituted an appeal to passion. The comments, along with the prosecutor's description of Bernice Clark's tragic experience, were based upon evidence to be presented at the trial, however, and were within the "broad scope of permissible argument." (*People v. Chatman* (2006) 38 Cal.4th 344, 387 [42 Cal.Rptr.3d 621, 133 P.3d 534] [the prosecutor properly could claim the defendant lied, lacked humanity, was frightening, and was barely human].)

### b. *Examination of witnesses*

Defendant contends the prosecutor committed misconduct "during the examination of witnesses by improperly injecting emotion into the guilt phase of the trial, seeking to elicit inadmissible evidence, and implying that the defense was obstructionist."

Defendant refers to the examination of Bernice Clark, alleging in his opening brief that the prosecutor asked her whether her grandson was "dead and buried by the time she was released from the hospital." The prosecutor did not make the comment that appears in defendant's opening brief. Rather, in the context of exploring the witness's memory of events from the time of the crime to the point when she gave a statement to the police during her hospital stay, the prosecutor inquired whether she recalled making the statement, whether she recalled when during the stay she had made the statement, whether she slept a great deal in the hospital, whether she remembered visitors, or whether the hospital stay "sort of [ran] together when you think back on it?" Bernice responded that she was not told about her grandson's death while she was in the hospital. When she added that she recalled hospital visits from her granddaughter and son, this colloquy ensued: "Q: And they had not told you yet that—[¶] A: No. [¶] Q: That Lance was dead? [¶] A. No. [¶] [Q:] Did you go to his funeral? [¶] A: No. [¶] [Q:] You weren't even aware that it happened? *I mean, was he buried by the time you*

*found out that he was dead?* [¶] A: No, I found—I got to see him. I got to go to the mortuary. I just wasn't up to going to the funeral." (Italics added.)

There was no objection to the italicized question (or any portion of the surrounding examination), and the claim is forfeited. (*People v. Prince, supra*, 40 Cal.4th at p. 1275.) In any event, as in comparable cases the question "was not so likely to evoke sympathy in the jurors that we could conclude the question was misconduct, or even if it was, that any misconduct was prejudicial." (*People v. Riggs, supra*, 44 Cal.4th at p. 302 [the prosecutor asked the victim's father whether he had participated in making funeral arrangements for the victim].)

Defendant claims the prosecutor sought to portray prosecution witness Alphonso Odom in a sympathetic light by asking him irrelevant questions that served to inform the jury that the witness had a young son who had accompanied him to court and that Odom also had brought the child with him to an interview with the prosecutor. The court sustained defendant's relevancy objection. The defense did not object on the basis of prosecutorial misconduct, and the claim is forfeited. (See *People v. Prince, supra*, 40 Cal.4th at p. 1275.) In any event, any misconduct was harmless. When the court sustained the relevancy objection—if not before—the jury likely understood that Odom's status as a parent was irrelevant.

Defendant claims the prosecutor committed misconduct by proffering evidence of Odom's prior consistent statements. The question whether the prior statements were admissible and whether their admission was prejudicial already has been resolved against defendant. In any event, defendant did not object to the admission of the statements on the basis of prosecutorial misconduct, and the claim is forfeited. (*People v. Prince, supra*, 40 Cal.4th at p. 1275.)

Defendant contends the prosecutor committed misconduct during cross-examination of defendant. He refers to a question asking whether defendant had discussed his testimony with his attorney prior to testifying. An objection to the question was sustained, and defendant did not answer it. No conceivable prejudice ensued. (See *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 94 [the prosecutor noted the defendant had not mentioned the battered woman syndrome defense until her attorneys were appointed].) Defendant claims the comment added to the prejudice he suffered when the prosecutor during his closing argument to the jury assertedly accused the defense of fabrication, but, as we shall explain, we have concluded that the prosecutor's argument does not bear that interpretation.

Defendant contends the prosecutor committed misconduct while cross-examining defendant by commenting upon defendant's answers. He refers to

the following line of questioning concerning defendant's statements to the police and his failure to inform the police that, as he testified at trial, LaCondra Douglas's boyfriend arrived at the scene during the robbery:

"Q: Well, you were trying to tell them the whole truth about what happened, weren't you?

"A: Yes, I just didn't tell—didn't put him in it.

"Q: Well, you could have said somebody pulled in, you didn't know who they were, right?

"A: I knew who the car . . . belonged to.

"Q: Right. But you hadn't had any compunction about lying to the police up to that point, right?

"A: I wasn't lying, I just didn't put him in there, sir. [¶] . . . [¶]

"Q: You're not scared?

"A: I'm just telling you the whole truth.

"Q: The jury will be the judge of that, Mr. Dykes."

Defense counsel objected on the ground the statement was argumentative, and the court sustained the objection.

As the examination progressed, the prosecutor asked defendant: "In other words, you're pretty good at lying with a straight face, are you, Mr. Dykes[?]" The court sustained a defense objection.

■ The prosecutor is entitled to attempt to impeach the credibility of a defendant's testimony (see *People v. Chatman, supra,* 38 Cal.4th at p. 382) and point out inconsistencies between his or her testimony and prior inconsistent statements. When a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and the scope of cross-examination is very broad. (*Id.* at pp. 382–383; *People v. Mayfield* (1997) 14 Cal.4th 668, 754 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Moreover, because the trial court sustained objections to the argumentative element of the prosecutor's questioning, we assume any prejudice was abated. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 943 [4 Cal.Rptr.2d 765, 824 P.2d 571]; see also *People v. Riggs, supra,* 44 Cal.4th at p. 299.)

Defendant challenges other aspects of the prosecutor's cross-examination. On direct examination, defendant testified he owned a firearm purely for self-protection because "at the time there [were] a lot of dope dealers on the street, they [were] having altercations . . . up the street . . . [and] I just felt I didn't want to be caught in it and be made a statistic." On cross-examination, the prosecutor also elicited testimony that defendant had purchased the firearm because there were drug dealers in the neighborhood. The prosecutor then asked defendant whether he had been a drug dealer himself, an accusation defendant denied. Then the prosecutor inquired: *"Do you recall telling the police when you gave the statement that you gave up selling dope when you met your girlfriend?"* (Italics added.) It is worth observing that according to Sergeant Chenault's interview notes from defendant's first unrecorded confession (marked for identification but not introduced into evidence), defendant informed the officers that when he met his girlfriend he "got out of dope."

Defendant did not respond to the question. Rather, he *volunteered*: "Sir, I had a conviction on—well, I don't think they convicted me of that, but I got caught in the car with my cousin who was a dope dealer, that's how it came about." The prosecutor elicited the admission that "this isn't the first gun that [defendant] ever owned," and that defendant had been on probation for illegal possession of a firearm when the murder occurred. The prosecutor inquired whether the other firearm owned by defendant had served merely for protection, too, and defendant answered in the affirmative. The prosecutor pursued the information volunteered by defendant in his previous answer:

"Q: *Do you recall when you were arrested with [the firearm] you were caught with drugs possessed in a package for sale?*

"A: They didn't catch me with . . . drugs, sir.

"Q: *Were you selling drugs with your gun back then?*

"A: No I wasn't, sir.

"Q: *And it's your testimony that you have never indicated to anyone that you were a drug dealer at that time?*

"A: No I didn't, sir.

"Q: I'm sorry?

"A: I didn't indicate nothing.

"Q: *And just for clarity when you were interviewed with the police you denied selling narcotics when you met your girlfriend, Bianca?*

"Mr. Strellis [defense]: Objection. Irrelevant.

"The Court: Sustained." (Italics added.)

The prosecutor maintained the question was relevant to defendant's statement regarding his reason for possessing the firearm, but the trial court again sustained the defense objection.

Defendant did not interpose a timely objection to this line of questioning. Counsel's ultimate objection was on the ground of relevancy, not prosecutorial misconduct, and he did not request an admonition. This claim is forfeited. (*People v. Prince, supra,* 40 Cal.4th at p. 1275.)

■ Defendant's claim also lacks merit. It constitutes misconduct to examine a witness solely for the purpose of implying the truth of facts stated in the question rather than in the answer to be given, and a prosecutor should not pursue a line of questioning that is damaging but irrelevant. (*People v. Mayfield, supra,* 14 Cal.4th at p. 753; see also *People v. Visciotti* (1992) 2 Cal.4th 1, 52 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People v. Hamilton* (1963) 60 Cal.2d 105, 116 [32 Cal.Rptr. 4, 383 P.2d 412], disapproved on other grounds by *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2 [36 Cal.Rptr. 201, 388 P.2d 33] and *People v. Daniels* (1991) 52 Cal.3d 815, 866 [277 Cal.Rptr. 122, 802 P.2d 906].) On the other hand, in the present case, defense counsel asked defendant why he purchased the firearm, opening the door to examination on the same point by the prosecution. The prosecutor was entitled to explore the credibility of defendant's claim that he had purchased a firearm solely for self-protection. The prosecution could have impeached defendant's denial that he had ceased his involvement with drugs (when he met his girlfriend) with the inconsistent statement defendant made to Sergeants Madarang and Chenault. In addition, during cross-examination, defendant volunteered information concerning his arrest, and the prosecution was entitled to explore defendant's assertions. We note that eventually a relevancy objection was sustained by the court and that the prosecutor did not refer to drug dealing in his closing argument, thereby diminishing the impact of this evidence.

Defendant also contends the prosecutor committed misconduct by objecting to the defense cross-examination of witness Dr. Lansing Lee, the ballistics expert. The murder weapon was not discovered; defendant testified that he had disposed of it in the Oakland Estuary. During the defense examination of Lee, defense counsel inquired whether the murder weapon's functioning, including its trigger pull, would be "partly personal to the history of the

particular firearm?" The expert answered in the affirmative. The defense then inquired: "And we have no idea since we don't have the firearm that fired the projectiles in this case?" The prosecutor objected: "Well, objection, your honor. That assumes facts not in evidence that the defense doesn't know where the gun is. There's no evidence." The court responded by requesting that defense counsel rephrase the question. Defendant now contends the prosecutor's objection "furthered the prosecutor's goal of arguing that the defense was obstructing the case, even to the point of creating a defense out of whole cloth."

The defense did not object on the ground of misconduct and the claim is forfeited. (*People v. Prince, supra*, 40 Cal.4th at p. 1275.) In any event, defendant admitted he had disposed of the murder weapon, providing damaging evidence that the weapon was not available for testing by the ballistics expert because of defendant's effort to escape responsibility for the crimes. There was no conceivable prejudice arising from the prosecutor's speaking objection.

Defendant claims the prosecutor committed misconduct by eliciting inadmissible evidence of absence of remorse. He refers to the prosecutor's examination of Sergeant Madarang.

The prosecution questioned Sergeant Madarang concerning the course of events leading to defendant's tape-recorded statements to the police. Madarang described defendant's initial denial of responsibility, commenting that defendant's manner was composed, he did not appear intoxicated, and the denial was quite convincing—except that, as Madarang testified, the officer was aware of facts contradicting some of defendant's assertions. When Madarang confronted defendant with eyewitness accounts, defendant became emotional, eventually admitting most of his role in the crimes during two statements interrupted by audible sobbing. Defense counsel agreed that the tape-recorded statements should be played to the jury "because I feel the inflection with which the words are said is part of the impact of the words." After the jury listened to the tape-recorded statements, the prosecutor asked Madarang whether defendant had wept during the period of questioning in which he denied responsibility. Madarang replied in the negative. In cross-examining Madarang, defense counsel established that defendant's voice had not been recorded during the period he denied responsibility but during the taped confessions "we can hear for ourselves what his voice sounded like."

Defendant did not object to the question posed to Sergeant Madarang, and the claim is forfeited. (*People v. Prince, supra*, 40 Cal.4th at p. 1275.) Defendant now contends that an admonition would not have cured the harm. He asserts that "[t]he evidence of lack of remorse was designed to prejudice

the jury against [defendant] by depicting him as a cold, remorseless killer who only displayed emotion when he was faced with having his confession audio taped." He claims the inadmissible testimony made him appear to be a "hardened killer" and constituted "inadmissible negative character evidence."

"[U]nless a defendant opens the door to the matter in his or her case-in-chief [citation], his or her remorse is irrelevant at the guilt phase." (*People v. Jones* (1998) 17 Cal.4th 279, 307 [70 Cal.Rptr.2d 793, 949 P.2d 890].) Defendant's sobbing during his tape-recorded statements to the police and to the deputy district attorney, however, supported the inference that he experienced remorse. Indeed, during the prosecution's case-in-chief, when the prosecutor sought to introduce transcripts of defendant's tape-recorded confessions, the defense urged the jurors to listen to the recordings themselves in order to permit them to hear evidence of defendant's emotional state. Defendant testified that after committing the crime, he was unable to sleep, lost weight, and sought relief in drugs and alcohol, thereby suggesting emotional turmoil. In addition, the issue of defendant's demeanor and state of mind during his various statements to the police was relevant to the credibility of those statements. Under these circumstances, we conclude misconduct did not occur.

### c. *Closing argument*

Defendant contends the prosecutor committed misconduct in several respects. We observe, however, that "[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726 [47 Cal.Rptr.3d 326, 140 P.3d 657].)

Defendant claims the prosecutor committed misconduct during closing argument by accusing him of fabricating a defense. Defendant cites the following portion of the prosecutor's argument in support: "And you might wonder as an aside, yesterday, when defendant was on the stand, how we get this new version, and I'll come back to this, that he was attempting to pull his hand out and get away [when the gun fired], at least that's the way I got it on his direct examination. *He knows the legal niceties here, ladies and gentlemen, he's had two years to study these instructions. He's got two lawyers.* So ask yourself, why now, in the 11th hour, we get the version he's attempting to pull his hand free of the car, he's just attempting to get away. He never actually said it. And he changed his story on cross-examination. But the gist of it, as I got it, is he was no longer committing robbery. And so I guess his act of trying to pull the hand from the car, trying to abandon the robbery, would not be an act in the furtherance of the robbery, I'm not trying to get the money, and therefore the special circumstance is untrue." (Italics added.)

Defense counsel objected to the argument, denying that defendant had suggested he was no longer engaged in the robbery when the fatal shot was fired. Defense counsel stated that "[t]he instruction, part of which counsel has read to the jury, points out that escape is part and parcel of a robbery. Had he studied the instruction it would have been clear that he would have read all of it and not part of it." In other words, defense counsel objected to the implication that defendant's testimony was tailored to fit a defense, because counsel conceded that a homicide committed during flight from a robbery constitutes felony murder.

In response, the court informed the jury that in closing argument, counsel may state the facts and the law according to their understanding of each. The court admonished, however, "I have stated the rules here, that if there is any variance as to what the facts are, as stated by either counsel, and what you believe them to be, accept your recollection of the facts [and] you are to follow the law as I state it."

Defendant's claim lacks merit. Defendant testified at the guilt phase of the trial, and the prosecutor was entitled to challenge his credibility and point to inconsistencies between his testimony and his earlier statements. It was within the broad bounds of permissible argument to suggest that defendant's trial testimony concerning the sequence of events leading to the murder, far from representing the truth, differed from his prior statements and was framed to coincide with an imagined defense based upon the asserted accidental nature of the killing. The commentary was appropriate in spite of defense counsel's concession that the accidental nature of the killing did not prevent conviction for felony murder. Defense counsel relied upon the claim of accident to urge that defendant lacked the intent to kill Bernice Clark, and defense counsel made the (unfounded) claim that the felony-murder special-circumstance allegation was not true because of the prosecutor's failure to prove an additional element of proof that the killing was intended to advance the robbery. The prosecutor's comment did not suggest that defense counsel had participated in fabricating a defense for defendant, nor did it constitute a personal attack upon counsel or counsel's credibility. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1154 [63 Cal.Rptr.3d 297, 163 P.3d 4], disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) Under the circumstances, the comment did not "focus[] the jury's attention on irrelevant matters and divert[] the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom." (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

Defendant contends the prosecutor committed misconduct during closing argument at the guilt phase of the trial by commenting upon the asserted

absence of remorse displayed by defendant. Defendant refers to the following statement: "When you listen to those tapes, ladies and gentlemen, and you hear him crying, *you don't see him crying here in court, you didn't see him crying on the witness stand yesterday. Do you really think those tears—who are they for? You think they're for Lance Clark or Bernice? Do you really think that? When he's crying on the tape, he's crying for himself, because he realizes his plan is not going to work, he's been identified.*" (Italics added.)

Because there was no objection to the comment, the claim is forfeited. (*People v. Stanley, supra*, 39 Cal.4th at p. 952.) We discern no reason that defendant could not have objected and sought an admonition. Moreover, as noted, defense counsel urged the court to permit the jury to hear the statements in which defendant's sobs were recorded. Defendant's own testimony suggested emotional turmoil. The prosecutor could comment upon an anticipated argument by defense counsel. (See *People v. Bemore, supra*, 22 Cal.4th at p. 846.)

Defendant next contends the prosecutor improperly introduced the issue of race into the deliberations during his rebuttal to defense counsel's closing argument. (It bears noting that defendant is Black; Bernice Clark is White, as was Lance Clark. It appears that the jury did not include any Black members.)

In his closing argument defense counsel informed the jury it would be instructed not to be influenced by "mere sentiment, conjecture, sympathy, passion, prejudice public opinion, or public feeling." Defense counsel then argued: "Why do you imagine the district attorney showed you the pictures of the dead lad? Why do you think he talked about Lance? Do you think there was any possibility he was appealing to your prejudice? [¶] He talked about people who are different from you, different lifestyle, different person.[6] Do you think there was a message in there? It gets lost, but it's there and it has an honest meaning." Later in his closing argument, defense counsel continued: "Do you understand why it was important that you see the picture of Lance, that you be told that he's—that [defendant] is different? Because we need some passion here. We need some blood. The cold facts are troublesome." Defense counsel returned to the theme of the jury's duty not to be moved by passion or prejudice, but to determine with care whether the prosecution had proved its case: "How can we make it beyond a reasonable doubt? We can if we're angry enough, if we want to pick the bad thing, if we

---

[6] The prosecutor previously had argued that defendant had planned the robbery, selecting "somebody he's got absolutely nothing against, and yet he's the kind of person that would pick someone like that to do this to, because he just doesn't care. He's not like you. That doesn't make sense to you. But then, you've never found yourself in a courtroom facing these kind of charges, either. And that's the difference between you and [him]."

want to make the choice? Because, after all, this is—he's different from us. But absent that kind of thinking, how do we make the choice?" Defense counsel added: "Now, [defendant], according to the district attorney, is not worthy of belief. He's—you know, he's different. He doesn't work. He's just—you know, he's a different species."

The prosecutor began his rebuttal with the following statement: "I guess I'm going to have to take the bait, because the defense—I'm sitting there trying to bite my tongue. The defense plays the race card as only a desperate defense attorney [*sic*]. I'm shocked, even someone of Mr. Strellis's reputation would resort to that." Defense counsel attempted to interject "Is the inference[?]," but the prosecutor continued: "I'm not asking you to convict [defendant] because he's Black. I'm asking you to convict him because he's guilty. He didn't rob Bernice Clark and kill Lance Clark because they're White. He did it because he thought they had money. This case has nothing to do with race. [¶] He is different from some other people. He's different from Mr. Odom. He's different than Mr. Chenault. He's different than LaCondra Douglas. He's different than his girlfriend. He is a murderer. [¶] Mr. Strellis is going to stand up here and tell you he's not any different than anybody else. If there are any other murderers in the courtroom, please stand up. He is different. [¶] But to suggest that it's because he's Black or somehow he's being prosecuted because he's Black that is the basis, sort of appeal to you, and again, I feel an obligation to respond to it. [¶] You know, for someone that wants you to really consider the facts and just go onto the facts, Mr. Strellis didn't mention the facts in his hour that he puffed on to you with his hot air about the law in Scotland or whatever it was."

The prosecutor's references to race did not constitute misconduct, but rather represented fair rebuttal to defense counsel's suggestion that the prosecution had attempted to play on the all-White jury's emotions and racial prejudice. The argument "did little more than urge the jury not to be influenced by [defense] counsel's arguments, and to instead focus on the testimony and evidence in the case." (*People v. Stanley, supra,* 39 Cal.4th at p. 952.)

Defendant claims that the prosecutor's comment, "I'm shocked, even someone of Mr. Strellis's reputation would resort to that," implied that Strellis had a poor reputation in the community. Defendant claims the statement relied upon the existence of evidence of poor reputation that was not contained in the record.

It is not clear from the statement that the prosecutor was suggesting that Strellis had a poor reputation. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a

reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183], disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) We are not persuaded that the jury drew the damaging inference suggested by defendant, but even if the comment was inappropriate, it constituted a mere passing reference of no real import to the case.

In any event, the prosecutor certainly did not accuse defense counsel of fabricating evidence or deceiving the jury on the facts. As noted above, the comment did not "focus[] the jury's attention on irrelevant matters and divert[] the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom." (*People v. Bemore, supra*, 22 Cal.4th at p. 846.) As we observed in a similar context, "[i]t was clear the prosecutor's comment was aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally." (*People v. Zambrano, supra*, 41 Cal.4th at p. 1155.) We have found misconduct to be absent from similar prosecutorial remarks. (*Ibid.*, citing *People v. Stitely* (2005) 35 Cal.4th 514, 559–560 [26 Cal.Rptr.3d 1, 108 P.3d 182] [the prosecutor warned the jury not to "fall for" defense counsel's "ridiculous" effort to let the defendant "walk free"]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1215–1216 [40 Cal.Rptr.2d 456, 892 P.2d 1199] [the prosecutor argued that defense counsel was a great lawyer because he spoke "out of both sides of his mouth"]; *People v. Breaux* (1991) 1 Cal.4th 281, 306–307 [3 Cal.Rptr.2d 81, 821 P.2d 585] [the prosecutor argued that law students are taught to create confusion to benefit the defense]; *People v. Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129] [the prosecutor claimed that the defense attorney's job was to confuse the jury and obscure the facts].)

Defendant draws our attention to another occasion on which he claims the prosecutor demeaned defense counsel. The prosecutor stated: "Mr. Strellis wants to try to confuse you about what the meaning of the special circumstance instruction is. Well, he's a skilled attorney, and he's doing the best he can." Because there was no objection at the trial, this claim is forfeited. (*People v. Stanley, supra*, 39 Cal.4th at p. 952.) In any event, such comments fall within the broad scope of permissible comment, as demonstrated by the cases cited above.

Defendant contends the prosecutor misrepresented the law pertaining to voluntary intoxication when he stated: "No act is less criminal because someone is in a state of voluntary intoxication. But you get to consider it on whether or not they actually formed the required mental state. . . . It is only if

you're intoxicated to the effect that you cannot appreciate what you're doing, where you don't actually have the required intent for the crime, that intoxication can be a defense." This claim is forfeited because defense counsel did not object. (*People v. Prince, supra*, 40 Cal.4th at p. 1275.) In any event, the court instructed the jury properly on the issue of intoxication, and it is not reasonably likely the jury would have understood the prosecutor—as defendant asserts—to claim that this defense may be established solely by evidence of "extreme" intoxication.[7]

Next, defendant contends the prosecutor committed misconduct by commenting on defendant's character. Defendant refers to these remarks: "To show the kind of person [defendant] is, he uses people. This is the kind of guy that will spend 90 bucks on a hot gun, and yet will kill somebody and rob a woman in order, to tell you, to get money for college tuition. And it doesn't stop there. It's not even his 90 bucks that he spends. He leeches $50 of it off his girlfriend, against her better judgment." Defendant also refers to another comment: "[Defendant] is the kind of person that, I think the evidence shows, will cause you to reexamine and rethink all your ideas about human decency and what should flow from what, as far as who deserves something, who doesn't deserve something, whether or not the right thing ever really happens in this world. [¶] And you're never going to meet Lance Clark, because of him, because of his greed, his selfishness, his self-centeredness, his refusal to do honest work." The prosecutor also claimed defendant lied under oath "at will."

Because there was no objection to these comments, this claim is forfeited. (*People v. Prince, supra*, 40 Cal.4th at p. 1275.) In any event, for the most part these remarks constituted proper comment upon the evidence and upon defendant's credibility as a witness. "Referring to the testimony and out-of-court statements of a defendant as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1].) There was evidence to support the inference that defendant lied when, among other occasions, he returned to the scene after the crimes and claimed he had observed an unknown Black man commit the crimes; when he contacted the police department to turn himself in; when he gave his statements to the police; in his testimony when he denied his

---

[7] The jury was instructed that: "Where a specific intent or mental state is an essential element of the crime . . . you should consider the defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent or mental state at the time of the commission of the alleged crime." The jury also was instructed: "Intoxication of a person is voluntary if it results from the use of any intoxicating liquor, drug or other substance knowing that it is capable of an intoxicating effect or when he or she willingly assumes the risk of that effect voluntarily."

girlfriend had given him money to purchase a firearm; and in his testimony when he denied having observed Lance in the car prior to the shooting. Moreover, the prosecutor is entitled to make a vigorous argument, and "opprobrious epithets" may be employed if "reasonably warranted by the evidence." (*Ibid.* [noting cases permitting argument that described the defendant as an "animal," "professional robber," or "vicious gunman"].) To the extent the prosecutor suggested that the jury draw inferences concerning defendant's guilt from conclusions regarding defendant's general bad character, any misconduct would not have affected the outcome or fairness of the trial in light of the overwhelming evidence of guilt introduced by the prosecution and defendant's own testimony.

Defendant contends the prosecutor committed misconduct in referring to the trial of O.J. Simpson. He refers to the following comment: "I just wanted to remind you the reason why we're here, if this seems like a big imposition on you, because I know that it is, it's been hard sometimes to break the news to you or I see on the judge's face, when we're going to break early or when there's going to be a delay to start. I assure you, we haven't been wasting time. It's just with the O.J. case, I know you're reliving some of the big imposition those jurors have on their life but I assure you, as the judge has indicated, when we do break early or oftentimes we're here before and after you come and go, but there are very important legal issues that we've been working on."

Because there was no objection, any claim of misconduct is forfeited. (*People v. Stanley, supra,* 39 Cal.4th at p. 952.) In any event, it is not reasonably likely the jury would understand this comment to refer, as defendant claims, "to the common view, at least among non-Black jurors, that Simpson got away with murder," nor would it, as defendant claims, "prejudice the jury in the prosecution's favor."

Defendant contends the prosecutor improperly bolstered the credibility of a prosecution witness with this comment: "If you believe [defendant], Sergeant Chenault is lying, risking his career and everything it stands for, to somehow frame this man." This claim was forfeited because there was no objection below, and in any event the remark constituted fair comment on the evidence. (See *People v. Chatman, supra,* 38 Cal.4th at pp. 381–383.)

Defendant contends that his failure to object to various asserted instances of misconduct should not stand as a barrier to appellate review of his claims. He argues that an objection and admonition would have been futile, because the misconduct was pervasive and created a "hostile trial atmosphere." As our discussion has demonstrated, the prosecutor did not engage in pervasive misconduct. Defendant's reliance upon *People v. Hill, supra,* 17 Cal.4th 800,

is misplaced. Unlike that case, which we have characterized as representing an "extreme" example of pervasive and corrosive prosecutorial misconduct that persisted throughout the trial (see *People v. Riel* (2000) 22 Cal.4th 1153, 1212 [96 Cal.Rptr.2d 1, 998 P.2d 969]), the present case did not involve counsel experiencing—as did counsel in *Hill*—a "constant barrage" of misstatements, demeaning sarcasm, and falsehoods, or ongoing hostility on the part of the trial court, to appropriate, well-founded objections. (See *People v. Hill, supra*, 17 Cal.4th at p. 821 [counsel risked "repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting [counsel] was an obstructionist [who was ] delaying the trial with 'meritless' objections"].)[8]

### 4. *Asserted cumulative error*

We have not identified any error that was prejudicial, whether considered separately or cumulatively. (See *People v. Salcido* (2008) 44 Cal.4th 93, 156 [79 Cal.Rptr.3d 54, 186 P.3d 437].)

### B. *Asserted Errors Affecting the Penalty Phase of Trial*

#### 1. *Evidence that defendant possessed a loaded and concealed weapon*

Defendant raises two challenges to the admission of penalty phase evidence concerning an incident in which he was discovered in illegal possession of a concealed weapon. His first claim is that the evidence was inadmissible because the incident did not involve a threat or implied threat of violence within the meaning of section 190.3, factor (b), and that admission of this evidence constituted a violation of the Eighth Amendment to the United

---

[8] Defendant contends the asserted misconduct constituted "plain error" that should be reviewed on appeal notwithstanding our rules pertaining to forfeiture. He claims that "virtually all jurisdictions" permit the reviewing court to reverse a conviction in some instances in which the error was not preserved in the trial court. This court has recognized exceptions to the forfeiture rule in cases of pervasive prejudicial prosecutorial misconduct (see, e.g., *People v. Hill, supra*, 17 Cal.4th at p. 821), but, as explained above, the instances cited in defendant's case do not fall within that category of cases. Defendant refers also to a federal rule of procedure permitting appellate courts to reach a claim of error that was not preserved below, when the error is clear or obvious and affects the defendant's substantial rights. (See *United States v. Olano* (1993) 507 U.S. 725, 730 [123 L.Ed.2d 508, 113 S.Ct. 1770]; Fed. Rules Crim. Proc., rule 52(b), 18 U.S.C.) Under that rule, however, ordinarily an error that " 'affect[s] substantial rights,' " occurs only when the defendant can demonstrate prejudice. (*United States v. Olano, supra*, 507 U.S. at p. 734.) Defendant has not demonstrated prejudicial prosecutorial misconduct, and even within the terms of the authority he relies upon, he fails to establish any behavior that is " 'inconsistent with the fairness and integrity of judicial proceedings . . . .' " (*People v. Wash* (1993) 6 Cal.4th 215, 277 [24 Cal.Rptr.2d 421, 861 P.2d 1107] (conc. & dis. opn. of Mosk, J.).).

States Constitution. His second claim is that the trial court abused its discretion in failing to strike certain testimony by Oakland Police Officer Rand Monda concerning the incident in question.

The prosecution presented evidence establishing that on December 16, 1991, defendant was detained on grounds not specified at trial. It was stipulated that defendant's "detention and arrest . . . were based on legal cause." Officer Monda testified that at approximately 9:30 p.m., he exited from his vehicle and approached defendant, who was wearing dark clothing, including a cap, "a dark puffy black jacket with a hood over his head, [and] . . . large black ski gloves . . . ." The officer directed defendant to identify himself and noticed that defendant was "fidgeting." In the absence of any request by the officer, defendant removed his cap and gloves and placed them on the roof of the patrol vehicle. Monda patted defendant down for his own safety and noticed that one of defendant's gloves contained a firearm. The weapon was a loaded and cocked .25-caliber semiautomatic firearm. One round was in the chamber of the weapon, and three rounds were in the clip. Monda requested that defendant sit in the back of the patrol vehicle while the officer checked for outstanding warrants and called for backup. Defendant was not handcuffed. Monda recalled that defendant had shouted at him from inside the vehicle when Monda retrieved the weapon. The officer testified that the incident was memorable, because he had not observed the weapon at the beginning of the encounter and "could have been shot." He explained: "Well, he had the . . . large ski glove in his hands. He had his hand in the glove and his gun, the gun was in his hand and he could have shot me and I didn't even see it. I wouldn't have even seen it coming." Monda thereafter transported defendant to jail.

Defendant claims the evidence was inadmissible because the incident did not involve a threat or implied threat of violence.[9] He contends that an interpretation of section 190.3, factor (b) that would permit the admission of such evidence would heighten the risk of arbitrary imposition of the death penalty, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

 Section 190.3, factor (b) permits the introduction of evidence in aggravation consisting of "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Evidence establishing that a defendant knowingly possessed a potentially dangerous weapon while *in custody* is admissible under section 190.3, factor

---

[9] Defendant objected on the same ground prior to trial. The trial court overruled the objection, observing that "someone who carries a loaded and concealed handgun is carrying a classical instrument of violence that is normally used only for criminal purposes."

(b), even when the defendant has not used the weapon or displayed it with overt threats. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Even in a *noncustodial* setting, illegal possession of potentially dangerous weapons may "show[] an implied intention to put the weapons to unlawful use," rendering the evidence admissible pursuant to section 190.3, factor (b). (*People v. Michaels* (2002) 28 Cal.4th 486, 536 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) For example, in the *Michaels* case, evidence was presented that the defendant had been discovered with a firearm concealed in the glove compartment of his parked vehicle and had been arrested for unlawful possession of knives on prior occasions. We noted the criminal character of the defendant's possession of these weapons, adding that similar knives had been used in charged offenses and that the concealed firearm had been employed in a robbery committed one day before the discovery of the weapon in the defendant's vehicle. Citing all of these circumstances, we concluded that the trial court did not err in admitting the prosecution's evidence for the purpose of demonstrating the defendant's commission of a prior crime involving the threat of violence. The defendant, we pointed out, was free to present evidence upon which the jury could base a contrary conclusion, such as "evidence . . . to show that his possession was for the purpose of self-protection, or the protection of someone else, not for criminal violence." (*Ibid.*)

Similarly, in the present case the jury legitimately could infer an implied threat of violence from all the circumstances, including the "criminal character of defendant's possession" (*People v. Michaels, supra*, 28 Cal.4th at p. 536; see §§ 12025, subd. (a), 12031, subd. (a)), the concealment of the loaded and cocked weapon in a manner that rendered it available for instant, surprise use, and defendant's use of a similar firearm in committing the present offense.

Defendant contends that possession of a firearm ordinarily is not illegal, that his possession would have been legal had he obtained a special permit to carry a concealed weapon, and that in some states permits are not required for the possession of concealed and loaded firearms. These circumstances do not detract from the conclusion that a jury could determine that defendant's possession of a loaded and concealed firearm, without the permit required in California, constituted a crime, and that an inference of an implied threat of violence properly could be drawn from the circumstances of the incident.

Defendant makes a brief reference to the Second Amendment to the United States Constitution, commenting that "[g]enerally, a defendant may lawfully possess a firearm," and surmising that it is "doubtful that the mere carrying of a firearm constitute[s] an implied threat of force or violence" and that the circumstance "that in California, such carrying is unlawful and constitutes a

misdemeanor, does not transform the conduct from one of innate self-protection into a threat against others."

In support of his claim, defendant refers to the solicitor general's briefing in a federal case. (*U.S. v. Haney* (10th Cir. 2001) 264 F.3d 1161.) More recently, however, the United States Supreme Court decided *District of Columbia v. Heller* (2008) 554 U.S. ___ [171 L.Ed.2d 637, 128 S.Ct. 2783] (*Heller*). In that case, the high court determined that a District of Columbia law prohibiting the possession of an operable handgun in the home was inconsistent with the Second Amendment to the United States Constitution. (*Heller, supra*, 554 U.S. at pp. ___, ___–___ [171 L.Ed.2d at pp. 679, 683–684].) Defendant does not contend that the California statutes prohibiting possession of a concealed, loaded firearm in a public place are void under the Second Amendment. He merely suggests that, because persons have a right to bear arms, their possession of a firearm does not, in itself, suggest a threat of violence. We have concluded, however, that the evidence in the present case would permit the jury to infer an implied threat of violence.

■ In any event, the court in *Heller* disapproved a statute that prohibited possession of an ordinary handgun *in the home*. Although the high court determined that the Second Amendment referred to an "individual right to keep and bear arms" (*Heller, supra*, 554 U.S. at pp. ___, ___–___ [171 L.Ed.2d at pp. 659, 675–677]), the court warned that this right was not unlimited. The court did not recognize a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," observing that historically, most courts have "held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." (*Id.* at p. ___ [171 L.Ed.2d at p. 678].) The high court's decision in *Heller* does not require us to conclude that possession in a public place of a loaded, cocked, semiautomatic weapon with a chambered round, concealed in a large glove and ready to fire, cannot be defined as a crime under state law. Moreover, nothing in that decision requires us to conclude that such conduct cannot be considered as carrying an implied threat of violence.

In a related claim, defendant contends the trial court should have stricken Officer Monda's testimony that he "didn't even see the gun" and that he "could have been shot." According to defendant, "[e]ven if evidence regarding this incident was admissible as evidence in aggravation under factor (b), Officer Monda's testimony that he remembered the incident 'because [he] could have been shot,' was irrelevant, unduly prejudicial, and should have been stricken."

This evidentiary claim is forfeited, as is defendant's related suggestion that the testimony in question constituted improper victim-impact evidence, because, as defendant concedes, defense counsel did not object to the testimony

at trial on the basis stated in this claim. (See *People v. Partida, supra*, 37 Cal.4th at pp. 433–434.)[10] In any event, the testimony was relevant to Monda's credibility and reliability as a witness, specifically to his ability to recall the incident accurately after the lapse of three and one-half years. The evidence also was relevant to the question whether defendant's possession of the firearm carried an implied threat of violence within the meaning of section 190.3, factor (b). The evidence was not offered or referred to in argument as victim-impact evidence. We are confident the jury understood in what respect the evidence was relevant in light of pattern instructions explaining how the jury was to consider evidence in connection with section 190.3, factors (a) and (b) (see CALJIC Nos. 8.84.1, 8.85, 8.88), and pattern instructions concerning the consideration of and burden of proof applicable to evidence of illegal possession of a firearm (see CALJIC Nos. 3.31, 8.87, 16.460, 16.470; see also CALJIC Nos. 2.01, 2.02, 2.90).

Defendant claims the trial court should have excluded this evidence because it was more prejudicial than probative within the meaning of Evidence Code section 352. To the extent the trial court retains such discretion in this context (see *People v. Box* (2000) 23 Cal.4th 1153, 1200–1201 [99 Cal.Rptr.2d 69, 5 P.3d 130]), the failure of the court to exercise that discretion is forfeited on appeal when the claim was not raised below (*People v. Davenport* (1995) 11 Cal.4th 1171, 1205 [47 Cal.Rptr.2d 800, 906 P.2d 1068], disapproved on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344]).

### 2. *Admission of victim-impact evidence*

Defendant contends "almost all" of the victim-impact evidence introduced at trial was admitted in error. Defendant claims that this evidence introduced passion and prejudice into the penalty phase proceedings and created an "unreasonable risk of an arbitrary result." He asserts the evidence was so prejudicial that its admission deprived him of due process of law and resulted in an arbitrary penalty decision in violation of the Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the California Constitution.

Over objection, the prosecutor presented victim-impact evidence through the testimony of Lance's teacher, Judy Schaff, his grandmother, Bernice Clark, and his sister, Kristie Clark. In addition, three still photographs and a videotape were introduced into evidence.

Schaff testified that she was on vacation when she learned Lance had been murdered; that Lance was a quiet student who was well liked by other

---

[10] Defendant's assertion that this court must reach the claim because it represents "plain error" is without merit, for the reasons stated *ante*, at page 775, footnote 8.

students; that he helped others; that she had seen Lance for the last time at a school party attended by Lance's sister Kristie; and that the school conducted a memorial for Lance.

Bernice Clark testified concerning the plans she and Lance had had for the day he was murdered, her profound sense of loss after his murder, and the sense of loss, fear, and dislocation suffered by Lance's younger brother as a result of the murder. Some comments were especially poignant. For example, Bernice testified that on the day he was murdered, Lance had planned to buy a toy for his younger brother with money he had saved from his allowance. She also said of Lance that "[h]e was always going to be my protector and he would go, every night and do his exercise" in order to grow big and sufficiently strong to protect her.

Kristie Clark was 21 years of age when the murder occurred. She testified that she learned of the murder on the day it occurred while she was shopping for clothing to wear to her grandfather's funeral. She described her shock when a physician at the Oakland Children's Hospital gave her the news that Lance was dead. She was unable to share the news with her grandmother, Bernice Clark, for several days, because of her grandmother's uncertain medical condition. She described the sorrow experienced by Bernice and by Lance's younger brother, for whom Lance had served as a protector and comforter. Kristie was the family member who made the funeral arrangements for Lance. She described in moving terms the sorrow and sense of unreality she experienced while making those arrangements: "We . . . special ordered [a casket], a medium-sized one because the large ones made him look too small and the baby one made him look too big." She said of Lance's younger brother that after the murder, he "was still kind of waiting for him to come home. I mean he realized he was buried, he did attend his funeral, but that didn't all click together."

Kristie also described Lance. She testified that he had been an amusing child who loved animals; that he had celebrated his birthday just four or five days prior to the murder; that he was a Cub Scout; and that she had served almost as a surrogate mother for him because his mother was "unreliable." She described the impact of Lance's murder on her. She said she missed having Lance comfort her when she was sad ("he would come up and give you a hug and kiss and say I love you"), and that "you miss more than anything just the little things. I mean eating popcorn, sitting in your chair with you at night or . . . watching videos with you, and just little things you miss."

The prosecutor played a videotape depicting preparations for and enjoyment of a family trip to Disneyland. Kristie identified persons depicted in the videotape.

 The applicable law is settled. "In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. [Citation.] Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353].)

In *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*), the United States Supreme Court explained that a relevant consideration for sentencing authorities traditionally has been the "specific harm caused by the crime." (*Id.* at p. 825.) In order to understand the harm caused by the crime, a state may choose to permit the introduction of victim-impact evidence because such evidence is "designed to show . . . each victim's 'uniqueness as an individual human being . . . .' " (*Id.* at p. 823, italics omitted.) The high court determined that the state should not be prevented from "offering 'a quick glimpse of the life' which a defendant 'chose to extinguish,' [citation], or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." (*Id.* at p. 822.) In sum, "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." (*Id.* at p. 827.)

On the other hand, as the high court recognized, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." (*Payne, supra*, 501 U.S. at p. 825.) State law is consistent with these principles. "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775]; cf. *People v. Edwards* (1991) 54 Cal.3d 787, 835–836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

It is difficult to discern the exact nature of defendant's claim. He argues that victim-impact evidence necessarily is prejudicial, but the high court has concluded that states are not precluded from permitting such evidence at the penalty phase of a trial. Defendant argues that victim-impact evidence is particularly prejudicial when the victim is a child. As defendant contends, evidence concerning the impact of the death of a child on his or her family and friends is particularly poignant, but within the meaning of *Payne, supra,*

501 U.S. 808, such evidence remains relevant to the jury's understanding of the harm caused by the crime.

 In the present case, the trial court carefully considered whether the proposed testimony fell within appropriate limits, making every effort to ensure that it was not inflammatory. Lance's parents did not testify, because the prosecutor feared that their testimony would be inflammatory, a concern shared by the trial court. The court emphatically admonished counsel to prepare witnesses well to avoid inflammatory emotional remarks and to ensure they did not blurt out their views concerning the crime itself, defendant, or the appropriate penalty. The child's grandmother and his sister testified regarding their feelings of loss, but the testimony was not dramatic or inflammatory. (See *People v. Smith* (2005) 35 Cal.4th 334, 365 [25 Cal.Rptr.3d 554, 107 P.3d 229] [permissible victim-impact evidence included mother's testimony concerning the loss of her child: " 'I don't think the pain will ever go away . . . I think the worst part of it is . . . what goes on in my mind what happened to him. What he went though is . . . just very difficult.' "]; *People v. Benavides, supra,* 35 Cal.4th at p. 105 [permissible victim-impact evidence was admitted through the testimony of the aunt and cousins of an infant victim, concerning the agony caused to the family, including the infant's sister, by the victim's death].) And, contrary to defendant's claim, the evidence received in the present case had no tendency to arouse racial animus.

Defendant contends Bernice Clark should not have been permitted to testify concerning anything but "the immediate effects of the crime." He complains specifically that she should not have been permitted to describe her and Lance's plans for the day, including Lance's intention to buy a toy using money he had saved from his allowance. Such testimony, however, plainly concerns the circumstances of the crime within the meaning of section 190.3, factor (a). We have rejected similar claims. (*People v. Edwards, supra,* 54 Cal.3d at p. 833 [victim-impact evidence is not limited to "the immediate temporal and spatial circumstances of the crime" but includes " '[t]hat which surrounds [the crime] materially, morally, or logically' "].)

 Defendant contends the testimony of the witnesses concerning the impact of the crime on them was too extensive. We disagree. The prosecutor's questioning was relatively brief—five pages of transcript in the case of Schaff, nine pages of transcript in the case of Bernice Clark, and 18 pages of transcript in the case of Kristie Clark. Defendant counters that victim-impact evidence ordinarily is permitted when it supplies a "quick glimpse" of the victim and the impact of his or her death on others, but that in the present case, "most" of the single day devoted to the evidentiary portion of the penalty phase was devoted to victim-impact evidence. He does not identify

any persuasive basis for a rule that victim-impact evidence may not form a substantial portion of a prosecutor's case in aggravation. Indeed, we have rejected the claim that the evidence must be confined to a single witness. (*People v. Zamudio* (2008) 43 Cal.4th 327, 364 [75 Cal.Rptr.3d 289, 181 P.3d 105]; see also *People v. Pollock, supra*, 32 Cal.4th at p. 1183.)

Defendant contends the witnesses should not have been permitted to testify concerning the victim's character, but such evidence conveys the insight into the victim that the high court has concluded is appropriate. (*Payne, supra*, 501 U.S. at pp. 823, 827.) Contrary to defendant's claim, this evidence was not inflammatory. Rather, it resembled victim-impact testimony we have accepted as appropriate in many cases. (See, e.g., *People v. Cruz* (2008) 44 Cal.4th 636, 652, 682 [80 Cal.Rptr.3d 126, 187 P.3d 970] [the evidence included testimony by the victim's wife and children concerning the sorrow they felt and the devastating impact of the crime on their lives, as well as evidence concerning the victim's professional life]; *People v. Boyette* (2002) 29 Cal.4th 381, 444 [127 Cal.Rptr.2d 544, 58 P.3d 391] [family members expressed love for the victims and explained their sense of loss; photographs depicted the victims in life].)

Defendant contends that section 190.3, factor (a) must be construed to restrict the scope of victim-impact evidence in order to avoid constitutional deficiencies, including concerns that the statute is unconstitutionally vague and permits arbitrariness in the penalty decision. Defendant contends that this court must afford a narrow interpretation to section 190.3, factor (a), limiting victim-impact evidence to evidence (1) given by a family member who was at the scene of the crime or immediately thereafter; (2) describing circumstances known to or reasonably foreseeable to the defendant at the time of the murder; and (3) presented by a single witness. We have rejected similar claims, and defendant has not persuaded us to reconsider those decisions. (*People v. Pollock, supra*, 32 Cal.4th at p. 1183; see also *People v. Zamudio, supra*, 43 Cal.4th at pp. 364–365; *People v. Lewis and Oliver, supra*, 39 Cal.4th at p. 1057.)

Defendant also challenges the court's decision to permit the prosecution to present evidence in the form of the eight-minute videotape, that, as noted above, depicted Lance Clark and family members preparing for and enjoying a trip to Disneyland. The videotape began with a clip of Lance having climbed up a tree. It then portrayed Lance spending time with family members. The tape included parts of the drive to Southern California and displayed the family interacting in a hotel room. The videotape occasionally focused on Lance, who often is smiling or making amusing gestures to the camera, but it also included footage of other family members.

Defendant contends that the videotape constituted improper victim-impact evidence because it was inflammatory and went beyond the "quick glimpse" of the victim contemplated by *Payne, supra,* 501 U.S. 808. He stresses that the videotape was highly prejudicial in light of Kristie Clark's courtroom demeanor and testimony, which "contrasted sharply and painfully" with the happy images of her, Lance Clark, and others on the videotape. He stresses the prejudicial impact of observing a young murder victim happily climbing a tree and seeing him, his younger brother, and other family members happily anticipating and undertaking a journey to Disneyland.

■■■ There is no bright-line rule pertaining to the admissibility of video-tape recordings of the victim at capital sentencing hearings. (*People v. Prince, supra,* 40 Cal.4th at p. 1288.) We consider pertinent cases in light of the general understanding that the prosecution may present evidence for the purpose of reminding the sentencer that " 'the victim is an individual whose death represents a unique loss to society and in particular to his family' " (*Payne, supra,* 501 U.S. at p. 825), but that the prosecution may "not introduce irrelevant or inflammatory material" that " ' "diverts the jury's attention from its proper role or invites an irrational, purely subjective response." ' " (*Prince, supra,* at p. 1288, quoting *People v. Edwards, supra,* 54 Cal.3d at p. 836.)

"Courts must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim. Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents." (*People v. Prince, supra,* 40 Cal.4th at p. 1289.)

Videotaped evidence nevertheless may be relevant to the penalty determination, because it "humanize[s] [the victim], as victim impact evidence is designed to do." (*People v. Kelly* (2007) 42 Cal.4th 763, 797 [68 Cal.Rptr.3d 531, 171 P.3d 548].) For example, a videotaped photomontage may convey the family and society's loss; it may "help[] the jury to see that defendant took away the victim's ability to enjoy her favorite activities," and may "further illustrate[] the gravity of the loss by showing [the victim's] fresh-faced appearance before she died." (*Ibid.*)

The trial court exercised appropriate caution to avoid introducing irrelevant drama and undue emotion into the penalty determination. The court carefully reviewed the videotape prior to its admission, ordered the audio portion deleted, and vigorously cautioned the prosecutor to ensure that Kristie Clark's commentary during the playing of the videotape should be unemotional.

Like the trial court, we have reviewed the tape to determine whether it contains elements that are irrelevant to the penalty determination. We agree with the trial court that the material, which merely depicts ordinary activities and interactions between Lance Clark and his family, was relevant to humanize the victim and provide some sense of the loss suffered by his family and society. The videotape is an awkwardly shot "home movie" depicting moments shared by Lance with his family shortly before he was murdered. The videotape does not constitute a memorial, tribute, or eulogy; it does not contain staged or contrived elements, music, visual techniques designed to generate emotion, or background narration; it does not convey any sense of outrage or call for vengeance or sympathy; it lasts only eight minutes and is entirely devoid of drama; and it is factual and depicts real events. (See, e.g., *People v. Zamudio, supra,* 43 Cal.4th at pp. 366–367; *People v. Kelly, supra,* 42 Cal.4th at pp. 797–798.) The evidence supplemented but did not duplicate Kristie Clark's testimony, and her narration was not objectionable. We conclude the trial court did not err.

Defendant claims the prosecutor should have accepted his offer to stipulate that he would not offer evidence in mitigation in the event the prosecution would agree not to introduce victim-impact evidence. He points out that the court in *Payne* expressed the view that it would be unfair to deny the prosecution the opportunity to offer evidence of the harm caused by the defendant's crime while permitting the defendant to introduce relatively unlimited evidence to paint a full picture of his or her life experience and character for the purpose of eliciting sympathy. Contrary to defendant's view, however, the high court did not suggest that prosecution victim-impact evidence was admissible solely to rebut the mitigating impact of evidence submitted by the defense. As noted, the court stressed the traditional and permissible place in the sentencing determination of a consideration of the "specific harm caused by the crime in question." (*Payne, supra,* 501 U.S. at p. 825.) As for defendant's offer to refrain from producing evidence in mitigation in return for similar silence from the prosecution, it was not within defendant's power to force the prosecution to refrain from presenting a persuasive case in aggravation through the introduction of relevant, admissible evidence. Ordinarily the prosecution " 'cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness.' " (*People v. Garceau* (1993) 6 Cal.4th 140, 182 [24 Cal.Rptr.2d 664, 862 P.2d 664], disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; see also *People v. Salcido, supra,* 44 Cal.4th at p. 147.)

Defendant adds that the victim-impact evidence should not have been admitted or permitted to form a basis for the prosecutor's argument because, in his view, there was little evidence in aggravation and the mitigating factors far outweighed the aggravating factors—a claim he bases

in part upon the circumstance that the jury's deliberations on penalty occupied a period of approximately seven days. We have not restricted victim-impact evidence to cases in which it would have little effect upon the verdict. Victim-impact evidence is relevant to the penalty determination because such evidence provides the jury with an idea of who the victim was and of the impact of his or her death on family and close friends. The relevance of the evidence does not depend upon the strength or weakness of the prosecution's case in aggravation. Although this type of evidence should not be admitted if it is inflammatory, as long as it is otherwise admissible, it properly may form a basis—along with the prosecutor's related argument—for the jury's decision in favor of the death penalty.

### 3. Asserted prosecutorial misconduct

Defendant contends the prosecutor engaged in an egregious "pattern of misconduct" throughout the penalty phase, thereby denying him a fair trial under the Fifth and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, and requiring this court to set aside the death judgment. We disagree.

As at the guilt phase of the trial, at the penalty phase a prosecutor commits misconduct under the federal standard by engaging in conduct that renders the trial so unfair as to constitute a denial of due process. (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642 [40 L.Ed.2d 431, 94 S.Ct. 1868]; *People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15].) State law characterizes the use of deceptive or reprehensible methods as misconduct. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) In order to preserve any claim of prosecutorial misconduct, there must be a timely objection and request for admonition. (*Ibid.*) " '[O]therwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*Ibid.*)

"For prosecutorial misconduct at the penalty phase, we apply the reasonable possibility standard of prejudice first articulated in *People v. Brown* [(1988)] 46 Cal.3d [432,] 448 [250 Cal.Rptr. 604, 758 P.2d 1135], and which, as we have later explained, is the 'same in substance and effect' as the beyond-a-reasonable-doubt test for prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1092 [81 Cal.Rptr.3d 651, 189 P.3d 911].)

Defendant faults the prosecution for dwelling on the victim-impact evidence in his closing argument to the jury, claiming that the prosecutor "urged the jurors to identify with the victims and the emotional pain of their

loss, . . . a tactic that . . . tends to inflame the emotions of the jurors." Even if we were to overlook defendant's failure to object to the argument, we would reject this claim. In closing argument, a prosecutor may rely upon the impact of the victim's death on his or her family. The prosecutor in the present case merely commented upon evidence we have determined was admissible, as he was entitled to do. (See *People v. Leonard, supra*, 40 Cal.4th at p. 1419.) Although the prosecutor's argument had emotional impact, it was permissible. We have acknowledged that emotion need not be eliminated from the penalty determination. Although emotion " 'must not reign over reason,' " it " 'need not, indeed, cannot, be entirely excluded from the jury's moral assessment.' " (*Id.* at p. 1418.)

Defendant asserts the prosecutor suggested the existence of facts outside the record and misstated the evidence. The prosecutor, in closing argument, addressed section 190.3, factor (i), concerning the age of defendant at the time of the crime. He stated: "The law allows you to consider the defendant's age. And he was young when he did this. He wasn't 18, but he wasn't an older individual. [¶] But ask yourself this, he'd been on probation for a year and a half for illegally possessing a gun, the gun was taken from him, and yet he chose to rearm himself and hatch this plan. *He might not be old chronologically, but as criminal age goes, he was well down the road. The system had tried leniency on him, probation had been tried.* [¶] *What did probation do? What did it result in? The leniency extended him through the court, what was the result of that? A woman shot through the neck and a dead child right beside her, with a different gun.* [¶] Did he learn from going through the court system the first time? What did he learn? He bought a bigger gun, and he made himself a promise, 'I'm not going to be identified, I'm going to wear a disguise, and if that doesn't work, there's something else I can do to make sure I don't get identified 'cause I don't want to go to jail.' [¶] So you can consider his age at the time of the crime. But before you find any mitigation there, consider not his chronological age but what his state of mind was and what choices he'd made before. It's not the first time he'd been in this position." (Italics added.)

Defendant claims on appeal that the italicized language constituted misconduct. He charges the prosecutor with misstating the evidence, because defendant was not "well down the road" to a life of crime but had one assertedly minor prior conviction. In addition, defendant claims the prosecutor's statement implied, or at least invited speculation, that defendant had a more extensive criminal record than appeared through the evidence introduced at trial. Defendant adds that the prosecutor should not have referred to the failure of probation, arguing that such a statement suggests that the only effective form of correction for failure on probation would be the death penalty.

These claims are forfeited because the defense did not object in the trial court. (*People v. Wilson* (2008) 44 Cal.4th 758, 800 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) In any event, the prosecutor's argument did not in the least suggest the existence of a more extensive criminal record than was established at trial, nor did it suggest an abstract rule that the sole appropriate punishment for failure on probation was the penalty of death. In addition, the prosecutor was entitled to request that the jury draw inferences from the record concerning defendant's culpability, on the basis of the evidence admitted pursuant to section 190.3, factor (b). It was for the jury to decide whether the inferences were reasonable. (See *People v. Wallace, supra,* 44 Cal.4th at p. 1094 ["[t]he absence of any deterrent effect from defendant's earlier brushes with the law was [a] . . . reasonable inference"].)[11]

Defendant claims the prosecutor committed misconduct by comparing defendant to other criminals during his discussion of section 190.3, factor (g), "[w]hether or not defendant acted under extreme duress or under the substantial domination of another person." The prosecutor argued: "This is not a situation where Leonard Lake is orchestrating the thing and perhaps influencing other people to do his bidding for him, or Mr. Koresh, down in Texas, or maybe with his extreme influence of the people that he was leading, caused them to do things they wouldn't ordinarily do. Not the reverend Jim Jones, down in Guyana. [¶] [Defendant] did this by himself. He thought about it himself. He planned this out himself. He profited by it himself. [¶] Factor (g) does not apply. There's no mitigation there."

Defendant claims his culpability was not comparable with that of the named individuals and that the argument constituted an appeal to passion and prejudice. This claim was not raised below and hence is forfeited. (*People v. Wilson, supra,* 44 Cal.4th at p. 800.) In any event, the claim is without merit. The prosecutor's point was that defendant did not act under the domination of another person. The reference to other named criminals served to illustrate the very different circumstances under which section 190.3, factor (g) in mitigation might apply. The prosecutor merely argued that unlike the persons who were dominated by Jim Jones, for example, defendant acted alone. Contrary to defendant's claim, the prosecutor did not suggest defendant *himself* was a mass murderer or serial killer with followers under his domination.

Defendant claims that several portions of the prosecutor's closing argument improperly compared the murder victim's family with defendant's family. In

[11] Defendant invites us to consider inferences that could be drawn by the jury from an examination of a report prepared by his investigator concerning postverdict discussions with jurors. (The report was attached to defendant's motion for new trial.) As we shall explain, the verdict cannot be impeached by such inadmissible hearsay. (See *post,* at pp. 810–811.)

discussing section 190.3, factor (k), the prosecutor explained that the defense was entitled to present evidence to persuade the jury to impose a sentence less than death. He characterized the testimony the jury had heard from defendant's family as a "bare request" that the jury spare his life. He sought to persuade the jury that such a "bare request" was not sufficient to supply a basis for the lesser punishment: *"They offered no opinion as to his character, they didn't tell you about anything good he'd ever done, but just the bare request, he's my relative, don't execute him. That's it. That's all that's been offered to you in mitigation."* (Italics added.)

Then, turning to the jury's duty to weigh circumstances in aggravation and mitigation, the prosecutor argued: *"And you're going to weigh that [the defense evidence] against the circumstances of the crime, the harm to the victim's family, and his other criminal conduct.* [¶] [I]t's a weighing process. And when you weigh what you heard yesterday by the defense against the rest of the case, it's inconceivable that the scales could turn out any other way." (Italics added.)

Returning to his argument that the jury should accord little weight to the defense evidence in mitigation, the prosecutor continued: "He has offered nothing to you that extenuates the gravity of the offense for which you've convicted him. You haven't heard anything redeeming about him. [¶] *Sure his mom came in, and I respect that, his father came in, and a couple of relatives that have seen him a total of five times in two years. You know, they're asked—called upon to come in here and try to say something to save [defendant]. And they did that, as a good family member would do. But don't you think they'd have seen him more than five times in two years if they were that concerned about it?* [¶] *Kristie went to see Bernice more times in two days than those two relatives have gone to see [defendant] in the two years since he committed this murder. That will show you something about legitimate concern or legitimate care.* [¶] And what I don't want you to think is I'm somehow casting aspersions about his family. I'm not. He's got a good family. In fact, the point is, the punishment is for [defendant], it's not for [his] family." (Italics added.)

The prosecutor continued in the same vein, comparing defendant with other persons in order to emphasize defendant's personal culpability. He also sought to minimize the weight of defendant's mitigating evidence on the ground that any mitigating value related to the witnesses, and not to defendant: "[Defendant] had a better upbringing, had better parents than the victim in this case did. He's had a job. He had a girlfriend, a nice woman, that he shook down for $50 to buy his second handgun, against her better judgment. [¶] But he knows what life's about. He knows the choices he makes. And he knows what life has to offer . . . . But he chose a different

path, and he chose it more than once. [¶] [Defendant] is responsible for this murder. Not his father, not his mother, not either one of his relatives, not his sister. [¶] The punishment that you decide in this case is for [defendant], and [defendant] alone, for what he did."

Defendant complains on appeal that the prosecutor improperly compared the regard borne by the victim's family for the victim, with the relative absence of concern about defendant, as inferred by the prosecutor from the testimony of members of defendant's family. Again, there was no objection and hence the claim of misconduct is forfeited. (*People v. Wilson, supra*, 44 Cal.4th at p. 800.) The claim also lacks merit. We do not believe the import of the prosecutor's argument was that suggested by defendant. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1192 [5 Cal.Rptr.2d 268, 824 P.2d 1315] [cautioning against lightly inferring that the prosecutor intended, or the jury understood, his or her remarks to have their most damaging meaning].) The witnesses in the present case merely recounted their attachment to the victim, an appropriate subject—and one appropriate for comment by the prosecutor. (See also *id.* at pp. 1191–1192.) Moreover, a prosecutor may compare the mitigating weight of a defendant's personal history with the impact of the crime on the victim's family. (*People v. Riggs, supra*, 44 Cal.4th at p. 324.)

We also agree with respondent that the prosecutor's comments concerning defendant's family simply noted the absence of mitigating evidence and, as the prosecutor cautioned expressly, were not intended to disparage defendant's family. It was appropriate to remind the jury that the penalty would be imposed upon defendant, not his family. (See *People v. Pride* (1992) 3 Cal.4th 195, 261–262 [10 Cal.Rptr.2d 636, 833 P.2d 643] [the prosecutor argued that sympathy for the victim's family should not extend to the defendant].)

Defendant claims misconduct based upon the comment that defendant "had a better upbringing, had better parents than the victim in this case did." He asks us to recall earlier statements defendant characterizes as suggesting that, because the victim's family expressed more concern for the victim than defendant's family expressed for him, the victim's life possessed a higher value than defendant's life. Defendant also challenges the following argument as a distortion of the proper weighing function assigned to the jury: "The reason we are here is because [defendant] took this person, this living breathing child, and turned him into this. [The prosecutor displayed an autopsy photograph to the jury.] [¶] That is the beginning and end of why we're here. [¶] *As I said to you before, the value that you place on anything is measured by the price that someone has to pay for taking it.* [¶] [Defense counsel]: I'm going to object to that. [¶] [Prosecutor]: So by your verdict—[¶] [Defense counsel]: Your honor, I'm going to object to that as inappropriate. [¶] [The court]: The objection's overruled [¶] [Prosecutor]:

*Again, the price I'm going to be asking you is for the life of this man.* The death penalty, under the laws of this state, is the appropriate punishment for what has occurred, for what [defendant] alone, himself, has done, and what you, by your unanimous verdict, have held him responsible for. *What was the life of Lance Clark worth?* That's the question submitted to you. [¶] What is the proper punishment for the person who took that life. What should happen to that person?" (Italics added.)

The prosecutor subsequently argued: "We have the death penalty in this state . . . because you can't bring those people back. *What value do you place on the people* who are gone and can't protect themselves. They're just part of eternity." (Italics added.) Defense counsel objected to this last argument, but the objection was overruled.

■■■ Defendant contends the prosecutor's argument constituted a prohibited attempt to inflame the passions of the jury. The argument essentially requested the jury to weigh the circumstances of the crime, including the victim-impact evidence, against the circumstances in mitigation, including the evidence that the jury had received concerning defendant's background. The prosecutor may urge that the death penalty is appropriate in light of the seriousness of the crimes (*People v. Salcido, supra,* 44 Cal.4th at p. 160) and may " 'remind[] the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society . . . .' " (*Payne, supra,* 501 U.S. at p. 825.)

Notwithstanding the defense's assertion that the prosecutor's italicized language suggested a mechanical weighing process, when we view these statements in the context of the prosecutor's argument as a whole we conclude he did not urge such a mechanical process but instead argued the jury should make a subjective moral evaluation of the appropriate punishment. In addition, we have held that the prosecutor may remark upon the function of the death penalty in exacting retribution on behalf of the community, as long as his or her remarks are not inflammatory and do not represent the prosecutor's main theme or argument. (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1178–1179.) We conclude the prosecutor's argument did not extend beyond permissible bounds by appealing solely to emotion.

Hewing to his theme that the jury should not accord much mitigating weight to the testimony given by defendant's family, however sympathetic the family members themselves appeared to the jury, the prosecutor argued: "You might ask yourself, why were those questions asked of [defendant's] father about his war record, which is admirable, and his 20 years of employment in Alameda County after he got out [after] serving 20 years in the Navy. They would like for you to feel that—they don't want you to focus

on him and his conduct, [defendant's] conduct, they want you to focus on the father and have you diverted into thinking that if you impose the death penalty that somehow it's hurting the father. That misses the point. You don't judge somebody in this world by what their parents are like. [¶] *The defense wants to make you feel like you'll be punishing good people that don't deserve punishment if you return a death verdict in this case. And I think we can understand why. There's nothing redeeming in [defendant] to point to. And so we'll try to hide behind his family. What other reason could there be for bringing that out? [Defendant] has a good family.*" (Italics added.)

Continuing the argument that the defense had presented the testimony of defendant's family solely to cause the jury to develop feelings of sympathy for the family members, the prosecutor argued that other reasons for calling family members did not exist, but certainly would have been argued had they been present. "*And you can bet your last dollar, if he had a dysfunctional family, that would be urged to you as a reason to give him life without parole. He never had a square shot in this world. He had a bad father, a bad mother, wasn't brought up right, never had a chance. That isn't the case. He had a good family. And you saw them here. And, if anything, that's less of a reason for him to do what he did.*" (Italics added.)

The prosecutor then claimed that if defendant had experienced the difficult family life endured by the murder victim, the defense certainly would have presented such evidence. Because, in the prosecutor's view, the defense would have made that argument had the evidence been available, the defense was "try[ing] to have it both ways." Thus, the prosecutor argued: "Think for a minute. What if Lance Clark had grown up and this had never happened to him, and he went out and did something like [defendant] did, and he was on trial? *If he were being defendant, they'd say, well, his father is a drug addict and a thief, how do you expect him to turn out. See, they try to have it both ways. They want you to judge him by virtue of his parents.*" (Italics added.)

Defendant contends the italicized portions of the argument constituted misconduct because they invited irrelevant speculation and suggested that the decision to present the testimony of defense witnesses concerning defendant's upbringing was cynical and hypocritical. This claim is forfeited because there was no objection. (*People v. Wilson, supra,* 44 Cal.4th at p. 800.) In any event, the claim also lacks merit, because the prosecutor's central argument was that the defense evidence in mitigation was meaningful only because it elicited sympathy for defendant's family. He urged the jury not to find mitigation on the basis of such sympathy. He suggested that sympathy for defendant's family could not be considered in mitigation. This argument is consistent with the law. (*People v. Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442]; see also *People v. Carter* (2003) 30 Cal.4th

1166, 1205 [135 Cal.Rptr.2d 553, 70 P.3d 981].) The suggestion of cynicism and hypocrisy on the part of the defense was a passing comment, not the sort of sustained broadside attack on defense counsel we condemned in *People v. Hill, supra*, 17 Cal.4th at pages 832–834.

Defendant claims the argument was particularly harmful because it played on the jurors' prejudice against criminal defendants based upon the assumption that all criminals seek to avoid responsibility for their actions, whereas he accepted responsibility by contacting the police and by testifying. In our view, however, the jury was perfectly capable of drawing its own inferences from the evidence and deciding whether it believed defendant had taken full responsibility for his actions. In the context of the argument as a whole, any prejudice arising from the prosecutor's suggestion could have been cured by a timely objection and admonition to the jury, and it was not reasonably possible there would have been a different outcome in the absence of the prosecutor's argument.

Defendant contends that the alleged misconduct in closing argument was particularly prejudicial, in part because "[t]he facts of [the] case did not strongly support the death penalty" and the jury deliberated the question of punishment for "at least seven full days." He also directs our attention to misconduct that assertedly occurred at the guilt phase of the trial, and claims that pervasive attempts to disparage defense counsel and to inflame the jury affected the verdict.

It is not our function to reweigh the case in aggravation and mitigation. In any event, although defendant characterizes his crime as an "impulsive robbery" ending in a death that was "not a calculated murder," there was evidence establishing that the robbery had been planned; that defendant had armed himself for the purpose of robbing a woman who was 70 years of age; and that when defendant shot Bernice Clark, he intended to kill her because she had recognized him and would be able to identify him. The jury properly was instructed that counsel's statements do not constitute evidence and that the jurors should decide the case purely upon the basis of the admitted evidence. Most jurors presumably are aware that defense counsel's duty to provide a vigorous defense extends to the penalty phase. In sum, it is not reasonably possible the verdict was affected by the prosecutor's suggestion that defense counsel would seize on any conceivable circumstance to influence the jury.

Defendant contends the prosecutor committed misconduct by requesting that the jury imagine the murder victim's experience: "Think about what it must have felt like for Lance Clark to have a hot piece of lead tear through his chest, go through his heart, his lungs, his liver and come out his back."

Defendant does not allege the argument misstates the evidence, and we have concluded that at the penalty phase, the prosecutor ordinarily may ask the jury to consider the pain suffered by the victim. (*People v. Stitely, supra,* 35 Cal.4th at p. 568; *People v. Cole* (2004) 33 Cal.4th 1158, 1233–1234 [17 Cal.Rptr.3d 532, 95 P.3d 811].) Contrary to defendant's claim, it is not improper at that phase of the trial for the prosecutor to "invite the jurors to put themselves in the place of the victims and imagine their suffering." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1212 [120 Cal.Rptr.2d 477, 47 P.3d 262].) We do not consider the prosecutor's statement inflammatory.

Defendant contends the prosecutor improperly urged the jury to consider the absence of mitigating evidence as a circumstance in aggravation. (See *People v. Davenport* (1985) 41 Cal.3d 247, 288–289 [221 Cal.Rptr. 794, 710 P.2d 861].) Defendant claims "[t]he prosecutor clearly argued that the evidence provided by [defendant's] family—a factor in mitigation under [section 190.3,] factor (k)—constituted evidence in aggravation and did not provide any extenuation for the crime, nor anything that the jury should consider. Further, by arguing that [defendant] had a better family than did the victim, the prosecutor implied that [defendant] should be punished for victimizing someone less fortunate than himself." Because defendant failed to object in the trial court, the issue is forfeited. (*People v. Wilson, supra,* 44 Cal.4th at p. 800; *People v. Wader* (1993) 5 Cal.4th 610, 659, fn. 9 [20 Cal.Rptr.2d 788, 854 P.2d 80].) This claim was not revived by the filing of a motion for new trial raising the *Davenport* claim. (*People v. Williams* (1997) 16 Cal.4th 153, 254 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

In any event, the prosecutor did not argue that the absence of evidence in mitigation constituted evidence in aggravation. In our view, he merely argued that defendant's proffered evidence in mitigation was not entitled to great weight, because its chief impact was to render the jury sympathetic to defendant's family members—and sympathy for family members is not properly considered in mitigation. The prosecutor's comparison between defendant's family and that of the victim, if considered in context, served to highlight the absence of any mitigating evidence of personal hardship in defendant's background.

### 4. *CALJIC No. 8.84.1*

During discussion of proposed penalty phase instructions to the jury, defendant requested that the language of pattern instruction CALJIC No. 8.84.1 be modified.[12] Counsel argued: "I do have a request for a

---

[12] The court delivered the pattern instruction as follows: "You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. [¶] You must accept and follow the law that I . . . state to you. Disregard all other instructions

modification . . . where the [instruction] reads, 'you must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings' . . . and 'the people and the defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict.' [¶] I would like to add a sentence to that . . . [saying] that you are to reach your verdict based upon the evidence, and should not either speculate, you know, not be subject either to speculation or conjecture." Counsel contended that the jury, rather than engage in conjecture, must make the penalty decision solely upon the basis of the evidence introduced at trial. He stated: "Clearly it's the law . . . that they can't speculate or conject[ure], but are only supposed to use the evidence as it's been presented to them. That was—conjecture, for some reason got left out of this instruction when they went over to capital. And I believe that to be a fair statement of the law."

The trial court declined defense counsel's invitation to modify the instruction, commenting that the proposed amendment to CALJIC 8.84.1 could have confused the jury in that it stood in tension with the normative and individualized nature of the jury's task at the penalty phase of the trial.

On appeal, defendant contends the trial court abused its discretion by refusing to add the language proposed by the defense. He claims that without the modification, the pattern instruction "allowed the jury to speculate regarding matters outside the guilt and penalty phase evidence."

"To determine whether the trial court erred in instructing the jury, 'we examine the entire record, including the instructions and arguments, to determine whether the jury was misled to the prejudice of the defendant about the scope of its sentencing discretion. [Citation.] We must ascertain whether, overall, the jury was adequately informed of the full nature of its sentencing responsibility, both as to the manner in which the various factors are to be weighed and as to the scope of its sentencing discretion. [Citation.]' " (*People v. Slaughter, supra,* 27 Cal.4th at p. 1215.) Ordinarily, " '[w]e presume that jurors comprehend and accept the court's directions.' " (*People v. Welch* (1999) 20 Cal.4th 701, 773 [85 Cal.Rptr.2d 203, 976 P.2d 754].)[13]

---

given to you in other phases of this trial. [¶] You must neither be influenced by bias nor prejudice against the defendant nor swayed by public opinion or public feelings. Both the people and the defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously and reach a just verdict."

[13] Defendant asserts that evidence submitted in support of his motion for new trial supports the view that jurors "in fact speculated about matters outside the record." He refers to hearsay evidence, consisting of postverdict remarks by jurors to a defense investigator. In a later discussion, we conclude those remarks should not be considered to impeach the verdict. (See *post,* at pp. 810–811.)

The trial court did not abuse its discretion. Defendant's concern that the jury not base its decision upon the existence of facts not introduced in evidence was met by other instructions. The trial court reminded the jury that they "must decide all questions of fact in this case from the evidence received in this trial and not from any other source." (CALJIC No. 1.03.) The jury's factfinding function was described adequately in this and other instructions.[14]

> 5. *Asserted error in responding to a question by the jury concerning section 190.3, factor (k) and the absence of remorse*

Defendant contends that the court erred in responding to a question posed by the jury during deliberations. According to defendant, the court's response directed that remorse not be considered as a factor in mitigation, and indeed that absence of remorse should be considered as a factor in aggravation. He claims the court's asserted error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by elevating absence of remorse into a circumstance in aggravation.

Defendant's claim is based upon the following circumstances. On the fifth day of deliberations, the jury delivered the following note to the court: "We the jury . . . request the following, the second paragraph on page 45 [of the written jury instructions] . . . states that we, as jurors, shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances. Are we to assume that these circumstances are A through K as stated on pages 25 through 27, or can we look at all the circumstances, regardless of being on A through K . . . , or not?"

The court responded that "the factors of aggravating and mitigating circumstances are stated in jury instruction 8.85, factors A through K . . . . [¶] However, I need to ask you a question as to the meaning of the last . . . paragraph of the note . . . . [¶] The last question, the one I'm inquiring about is, 'or can we look at all circumstances, regardless of being an A through K factor or not?' " At defense counsel's request the court inquired: "My question is, is there any particular evidence or testimony that is the subject of your inquiry here?"

The jury foreperson initially requested to consult with the jury as a whole, but then responded: "I would think it would be in regard to the circumstances

---

[14] We refer to portions of CALJIC Nos. 8.84.1 as delivered at trial ("You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise.") and 8.85 as delivered at trial ("In determining which penalty is to be imposed on the defendant you shall consider all of the evidence which has been received during any part of the trial of this case except as you may be hereafter instructed."). The trial court also repeated guilt phase instructions defining evidence, circumstantial evidence, inferences, and the manner in which various types of evidence should be considered and weighed.

in regard to information at the trial—all the information." The foreperson repeated: "I would think it would be in regard to the circumstances related to the trials, the testimony, and it would be in general."

The court responded as follows: "Then I will give you what is . . . a partial response, but I still think I need to have you focus with a little more specificity . . . as to what it is you're asking about or what it is you're thinking about in terms of that last question." The court continued: "When jury instruction 8.88 . . . states 'after having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed' . . . the applicable factors of aggravating and mitigating circumstances are defined in jury instruction 8.85 . . . and they are . . . found within items that are labeled parenthesis A through parenthesis K. [¶] Now, my question is, is there any particular testimony or evidence that you are inquiring about with respect to where it fits or could fit in that framework of factors that are listed A through K?"

The jury responded with two additional notes to the court. The notes read as follows: "Can we, as jurors, consider, take into account and be guided by anything other than the evidence which was received during both phases of the trial, as they pertain to factors A through K? Can we look at factors other than A through K, such as the remorse or lack of remorse exhibited by the defendant?" The second note read as follows: "Under K are we allowed to consider the pleas by both the victim's family and defendant's family?"

The court excused the jury for the day and discussed the notes with counsel. The matter was discussed in chambers again the following morning. Ultimately, the court responded to the two notes in comments and instructions that span six pages of transcript. Defense counsel agreed that the court's statements represented the appropriate response to the jury's questions.

Concerning remorse, the court responded to the jury's question as follows: "You may properly consider evidence tending to show remorse or the lack of remorse exhibited by the defendant, as you determine the evidence to be. [¶] To the extent such evidence tends to show the defendant's lack of remorse regarding the crimes of which he has been convicted, if you determine such to be the case, such evidence *may not be considered by you as a factor or circumstance in aggravation.* [¶] Lack of remorse, if such is the case, is not a factor in aggravation and cannot be considered as such by you. [¶] However, you may consider such evidence as tending to establish the absence or lack of remorse as a mitigating factor, in other words, as tending to show that remorse, an appropriate factor in mitigation in any case, under factor K, in

instruction 8.85, is absent in this case. [¶] Whether the evidence does, in fact, show the presence or absence of remorse as a mitigating factor under factor K, and the weight and significance, if any, which should be given such facts are exclusively matters for your determination." (Italics added.)

The court proceeded to discuss victim-impact evidence and the question whether the jury might consider factors other than those enumerated in the statute. "The factors set forth in jury instruction 8.85, paragraphs A through K, is the exclusive list of those factors which you shall consider, take into account and be guided by, if applicable. In other words, the only factors you shall consider, take into account and be guided by are those factors defined in paragraphs A through K in this instruction. [¶] However, I remind you of another principle . . . that you must consider the instructions as a whole . . . ." The court then reread pattern instructions CALJIC Nos. 8.85 and 8.88 to the jury.

As defense counsel at trial himself agreed, the court's instruction properly informed the jury in what respects remorse or absence of remorse were pertinent to section 190.3, factor (k), explaining plainly and repeatedly that absence of remorse may *not* be considered as a circumstance in aggravation, but that absence of remorse may be considered as " 'relevant to the question of whether remorse is present as a mitigating circumstance . . . .' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 356 [60 Cal.Rptr.3d 209, 160 P.3d 84].)

Defendant concedes that this court has concluded that a prosecutor may urge the jury to consider absence of remorse for the purpose of demonstrating the absence of a mitigating circumstance. Defendant claims, however, that although "such argument is permissible, an instruction from the trial court directing the jury to consider lack of remorse under [section 190.3,] factor (k) presents a reasonable likelihood of transforming lack of remorse into a factor in aggravation." This claim lacks merit, in view of the circumstances that the instruction was necessary because the jury requested guidance on this specific point (see § 1138), that the court gave an answer (consistent with the law) stressing evidence of absence of remorse could not be considered in aggravation, and that the answer to the jury's question was approved by defense counsel. (See *People v. Marks* (2003) 31 Cal.4th 197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222] [a response that is generally consistent with the law cannot be challenged for the first time on appeal in the absence of a request for modification or clarification]; see also *People v. Roldan* (2005) 35 Cal.4th 646, 729 [27 Cal.Rptr.3d 360, 110 P.3d 289] [if a party fails to object to a court's response to a question posed by the jury during deliberations, any claim on appeal based upon the court's response ordinarily is forfeited], disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; *People v. Benavides, supra,* 35 Cal.4th at p. 114 [same];

*People v. Martinez* (2003) 31 Cal.4th 673, 698 [3 Cal.Rptr.3d 648, 74 P.3d 748] [same]; *People v. Boyette, supra,* 29 Cal.4th at p. 430 [failure to object deemed a tacit approval]; and see *People v. Hughes* (2002) 27 Cal.4th 287, 402 [116 Cal.Rptr.2d 401, 39 P.3d 432] [trial counsel's *agreement* with court's response forfeits a claim of error on appeal].)

We do not find any merit in defendant's claims that the court's response was argumentative, favored the prosecution, or suggested that evidence in mitigation could not be considered or was absent.

### 6. *Absence of unanimity instruction*

Defendant contends the trial court erred by refusing to instruct the jury that it should not consider a factor in aggravation unless it had unanimously determined that defendant committed the act and that (in the case of § 190.3, factor (b)) it was established beyond a reasonable doubt that the uncharged criminal activity carried an implied threat of violence. Defendant claims a violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The jury was instructed it could not consider the uncharged criminal activity in aggravation unless defendant's guilt was proved beyond a reasonable doubt. The court supplied extensive instruction on the elements of the firearms offenses, concerning which evidence was introduced at the penalty phase. The court declined to require that the jury agree *unanimously* that the prior crime or crimes had been committed. The trial court also declined to instruct the jury that it must agree unanimously and beyond a reasonable doubt that the uncharged criminal activity involved a threat or implied threat of violence. The trial court acted appropriately.

The "jury need not unanimously agree on the truth of aggravating factors." (*People v. Hines* (1997) 15 Cal.4th 997, 1066 [64 Cal.Rptr.2d 594, 938 P.2d 388].) More specifically, "[j]ury unanimity is not required with respect to unadjudicated criminal conduct." (*People v. Harris* (2008) 43 Cal.4th 1269, 1316 [78 Cal.Rptr.3d 295, 185 P.3d 727].) Juries are not required to agree unanimously on "foundational" matters such as that a crime involving violence has been committed. (See *People v. Hines, supra,* 15 Cal.4th at pp. 1066–1067; see also *People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244].) We also have rejected claims that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], require juries to enter unanimous findings concerning aggravating factors. (*People v. Salcido, supra,* 44 Cal.4th at p. 167; see also *People v.*

*Williams* (2008) 43 Cal.4th 584, 649 [75 Cal.Rptr.3d 691, 181 P.3d 1035].) We decline defendant's invitation to reconsider our prior decisions.

### 7. *Court's asserted suggestion that the jury could reconsider its guilt phase "not true" finding*

As noted, at the guilt phase of the trial the jury convicted defendant of the first degree murder of Lance Clark and found true a felony-murder special-circumstance allegation. The jury also convicted defendant of the attempted murder of Bernice Clark but found not true an allegation that the attempted murder was willful, deliberate, and premeditated.

The jury posed the following question during deliberations: "Even though we agreed that the death of Lance Clark was murder of the first degree because it happened during the commission of a robbery (felony-murder law . . . are we now permitted to look at the willful, premeditated and deliberate nature of this killing under factor A?"[15]

The court responded: "You may consider such factors under factor A of jury instruction 8.85 in your consideration of the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true."

Defense counsel did not object to the court's response to the jury's question or request that the jury be reminded of its "not true" finding in connection with the allegation that the attempted murder of Bernice was willful, deliberate, and premeditated. Indeed, the court stated on the record that the court and counsel discussed the jury's questions and *agreed* upon the wording of the court's response.[16]

On appeal, defendant claims that the court's response failed to take into account the danger that the jury would reconsider its prior verdict. He claims

---

[15] This question was presented to the court at the same time the jury inquired whether counsel had entered into a stipulation concerning the prior incident involving a threat of violence.

[16] The court off the record discussed the jurors' queries with counsel, then returned to proceed on the record to summarize the substance of the unrecorded conferences. In doing so, the court failed to comply with section 190.9, which requires all conferences and proceedings during capital trials to be "on the record with a court reporter present." (See also *People v. Rundle, supra,* 43 Cal.4th at p. 110 [quoting statute].) The record is adequate for us to determine whether defense counsel preserved objections for appeal and to conclude that certain claims are forfeited, however, because the court placed a nearly contemporaneous description of the unreported conferences on the record and provided defense counsel and the prosecutor with an opportunity to comment and to preserve objections for the record. (See *id.* at pp. 111–112 & fn. 8.)

the jury's verdict on the charge of attempted murder of *Bernice* Clark—a verdict convicting defendant of the attempted murder but acquitting him of having committed a willful, deliberate, and premeditated attempted murder—established that the jury acquitted defendant of having committed a willful, deliberate, premeditated murder of *Lance* Clark, and that the jury should have been so informed to avoid violating double jeopardy principles that defendant invokes for the first time on appeal. Defendant claims that the unusual facts of the case established an implied acquittal, thereby requiring deviation from the general rule that, if the trial is based upon an accusatory pleading charging two or more crimes, "[a]n acquittal of one or more counts shall not be deemed an acquittal of any other count" (§ 954), and also from the general rule that " ' "[t]he murder of two persons, even by the same act, constitutes two offenses, for each of which a separate prosecution will lie, and . . . a conviction or acquittal in one case does not bar a prosecution in the other." ' [Citation.]" (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1039, fn. 4 [90 Cal.Rptr.2d 607, 988 P.2d 531].) He points to the circumstance that a single shot accomplished both the attempted murder and the murder, claiming that the jury's verdict on the attempted murder charge therefore essentially constituted a special verdict or finding with respect to the mental state involved in the murder. He claims this asserted special verdict should have barred "reconsideration" of willfulness, deliberation, and premeditation as circumstances of the crime under section 190.3, factor (a). He asserts the court's response constituted an error under section 190.3, factor (a), which refers only to consideration of circumstances of the crimes of which a defendant was *convicted*, and that the error violated the federal double jeopardy clause.[17] He also urges that the asserted error constituted a violation of the Eighth Amendment to the United States Constitution, because it undermined the reliability of the proceedings.

 We note that even if we were to accept the debatable general premise of defendant's collateral estoppel argument, his claim contains analytical flaws. For example, the "not true" finding constituted a finding that the prosecutor had failed to prove that the attempted murder of Bernice Clark was willful, deliberate, *and* premeditated, but the verdict did not establish that the jury agreed *none* of those mental states had been established. The verdicts certainly did *not* reflect a finding that the attempted murder of Bernice was not *willful*. A killing is willful if intent to kill is proved (*People v. Moon* (2005) 37 Cal.4th 1, 29 [32 Cal.Rptr.3d 894, 117 P.3d 591]), and the attempted-murder verdict established the jury found intent to kill (*People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730]). The element of

---

[17] Defendant refers to parallel provisions of the California Constitution but does not present separate argument and analysis based upon California law. Accordingly we do not address his claim under California constitutional law.

willfulness was the focus of the parties' closing arguments and was impervious to any possible attack based upon collateral estoppel principles.

In any event, defendant's claim is forfeited on appeal, because defendant did not object or request clarification at trial; he instead agreed with the court's formulation.

The court is under a general obligation to "clear up any instructional confusion expressed by the jury," but "[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, 1213 [275 Cal.Rptr. 729, 800 P.2d 1159]; see also *People v. Smithey* (1999) 20 Cal.4th 936, 985 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; § 1138.)

When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal. (*People v. Marks, supra*, 31 Cal.4th at p. 237; see also *People v. Roldan, supra*, 35 Cal.4th at p. 729; *People v. Benavides, supra*, 35 Cal.4th at p. 114; *People v. Martinez, supra*, 31 Cal.4th at p. 698.)

It is appropriate to apply this forfeiture rule in the present case. Guilt phase instructions permitted the jury to convict defendant of the first degree murder of Lance Clark on a felony-murder theory, which does not require proof of malice (*People v. Dillon* (1983) 34 Cal.3d 441, 474–475 [194 Cal.Rptr. 390, 668 P.2d 697]; see also *People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549]), or alternatively on the theory that the murder was committed with malice aforethought (§§ 188, 189). The jury evidently was concerned because it had based the first degree murder verdict on a felony-murder theory, but was uncertain whether at the penalty phase it was permissible to consider such mental elements as to which it had been instructed with respect to the other theory of first degree murder. The court's answer to the jury's question was correct in that a jury that has convicted a defendant of first degree murder on the basis of a felony-murder theory may consider, as part of its evaluation of the defendant's culpability and its moral and normative decision concerning the appropriate penalty, the defendant's state of mind with respect to the murder—that is, whether the defendant also intended to kill or acted with malice aforethought.[18] It was this information

---

[18] A defendant's culpable mental state may be considered a circumstance of the crime under section 190.3, factor (a). (*People v. Catlin* (2001) 26 Cal.4th 81, 175 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Even when the verdict is based upon a felony-murder theory, it is appropriate to

that the court's response conveyed, and we conclude the jury would have understood the court's response in this manner. If defendant wished to limit or clarify the information conveyed by the court, defense counsel should have requested limitation or clarification.

Defendant contends that although defense counsel did not object or request clarification at the time the court responded to the jury's question, his attorney subsequently brought the matter to the court's attention. We shall recount the action taken by defense counsel, but we emphasize that the ensuing discussion did not concern the response by the court that defendant now attacks on appeal. Rather, the discussion occurred *after* the court had proposed a response, secured defense counsel's agreement to the suggested wording, and delivered the agreed-upon explanation to the jury. Additionally, the discussion noted below occurred after the jury had resumed its deliberations, and after two of its members were excused.

The sequence of events was as follows. After two deliberating jurors were excused and alternate jurors were seated, the court and counsel discussed the principle that, after substitution of jurors during deliberations, the jury should be directed to begin its deliberations anew. The court expressed concern that the jurors might believe that because of the substitution they must "begin deliberations regarding the *guilt* phase of this trial again and that's clearly not the intent of the instruction or the law." (Italics added.) The court therefore proposed that the jury be directed to commence the penalty phase deliberations anew. Defense counsel commented: "And for the record . . . I am specifically requesting this because at the time of the guilt phase they found a nonpremeditated murder and I don't . . . want to revisit that. They have made a finding and I believe we have a right to have that finding be an appropriate finding." This comment clearly suggests that defense counsel did not believe the court's response to the jury's question suggested to the jury that it should reconsider its prior verdicts.

The prosecutor's subsequent reply is significant, because defense counsel stated he agreed with it. The prosecutor responded that it could not be determined that the jury acquitted defendant of the premeditated murder of Lance Clark and that, in any event, "they're free under the law to consider the circumstances of the offense as they see fit, . . . based on all the

---

consider any apparent premeditation on the part of the defendant as an aggravating circumstance of the crime. (See *People v. DePriest* (2007) 42 Cal.4th 1, 57 [63 Cal.Rptr.3d 896, 163 P.3d 896] [in denying a motion to modify the verdict, the trial court properly weighed the sentencing factors, including the "premeditated and brutal nature" of the attack on the robbery-murder victim]; see also *People v. Sturm* (2006) 37 Cal.4th 1218, 1246, fn. 1 [39 Cal.Rptr.3d 799, 129 P.3d 10] (dis. opn. of Baxter, J.) ["Of course, the guilt jury's failure to return a 'premeditated murder' verdict did not prevent the penalty jurors from concluding, as a circumstance of the crime [citation], that the murder *was* premeditated."].)

evidence . . . . But the fact that they had a reasonable doubt as to whether or not the murder was willful, deliberate and premeditated would not prevent them from considering either the theory of willful, deliberate and premeditated or *certain parts of it* and you never know if they had a reasonable *doubt as to one part* . . . . [¶] In any event, the burden of proof of the circumstances of the events is not beyond a reasonable doubt and therefore a jury could have conceivably been convinced to some extent that it was actually deliberate and premeditated *or some part thereof* and yet not be convinced beyond a reasonable doubt of that, but would be free to revisit those views as it bears on the circumstances of the offense because there is a different burden of proof, and by their finding that the attempted murder was not the finding, not the true premeditation clause, does not prevent them from considering any part of the state of mind that that instruction defines." (Italics added.)

The court stated it agreed with defense counsel that the jury should not recommence deliberations on the guilt verdicts. At the same time, the court added, "[t]he law is clear they should consider the circumstances of the crime as one of the factors under [section 190.3, factor (a)] as one of the things they may consider in determining appropriate penalty. [¶] So certainly they are free and I have told them previously in response to earlier notes that is precisely what they may do . . . ."

Defense counsel responded, *"I'm not arguing with his* [the prosecutor's] *statement as to what they can consider,* I believe the instruction [concerning recommencing deliberation] as amended more accurately tells them what they're supposed to be doing and with this jury I may not live long enough for them to go back and relitigate both parts of the case." (Italics added.)

The court instructed the jury to begin its deliberations "from the beginning," but explained: "You must therefore set aside and disregard all past deliberations at the penalty phase of the trial and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations at the penalty phase of the trial as if they [had] not taken place."

Under the circumstances described above, trial counsel did not preserve the issue that defendant now seeks to raise.

Moreover, we conclude it is not reasonably likely the jury would understand the court's response as an invitation to reconsider its verdict (see *People v. Cain, supra,* 10 Cal.4th at p. 69; see also *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 123), especially in light of the apparent purpose of the jury's question—to determine generally whether it could consider defendant's mental state with reference to the murder of Lance Clark

despite the circumstance that the murder verdict rested upon a felony-murder theory. Our examination of the arguments of counsel supports our conclusion. The focus of the closing arguments was upon intent to kill rather than premeditation; the prosecutor's closing argument did not suggest that the jury reconsider its prior guilt phase verdicts; and defense counsel reminded the jury that it had determined the attempted murder was not premeditated—a reminder that was not rebutted.

Thus, in his closing argument at the penalty phase of the trial, the prosecutor did not ask the jury to reconsider its prior finding that the allegation that the attempted murder of Bernice Clark occurred with premeditation, deliberation, and willfulness was not true. Rather, he informed the jury that he anticipated the defense would renew its claim that the shooting was accidental or at least did not involve intent to kill. He reminded the jury it had found intent to kill when it convicted defendant of the attempted murder of Bernice. The prosecutor argued that the robbery was planned and that when defendant prepared for the robbery, he contemplated the possibility he might employ deadly force against a weak and elderly victim. The prosecutor stressed that intent to kill could be inferred from this preparation and from the circumstance that defendant realized Bernice had recognized him.

For its part, the defense's closing argument reminded the jury of its apparent conclusion that the attempted murder of Bernice Clark involved intent to kill but was not premeditated, and it focused on asking the jury to recognize some lingering doubt concerning the question whether the shooting involved an intent to kill or was entirely accidental. Defense counsel urged that even if defendant formed the intent to kill, the death penalty was not warranted. The prosecutor did not offer argument in rebuttal to this point.

In addition, the jury did not pose a question specifically directed at reconsideration of prior guilt phase verdicts or findings, nor was the court's response directed to that possibility. We also note defense counsel's evident understanding that the trial court's response had *not* invited the jury to reconsider its prior guilt phase verdicts.

Furthermore, the court instructed and reinstructed the jury (in the terms of the statute) that it should consider the circumstances of the crimes of which defendant was *convicted*, thereby rendering it unlikely the jury would consider an allegation that it had found not to be true.[19] Finally, after the

---

[19] As we have observed, having received appropriate instruction—and reinstruction—in the language of section 190.3, factor (a), which permits the jurors to consider the circumstances of the crimes of which a defendant was *convicted*, it is not reasonably likely they "were misled to believe they should ignore their own not guilty verdict . . . ." (*People v. Cain, supra,* 10 Cal.4th at p. 69.)

alternate jurors had been seated, the court reminded the *reconstituted* jury to recommence deliberation solely on the potential *penalty* phase verdict—thereby informing the former alternates who had not participated in the guilt verdicts and findings that their task did not include reconsidering those matters. Under these circumstances, it is not reasonably likely the jury, including the newly seated alternates, would have reexamined the guilt phase verdicts.

### 8. *Asserted juror misconduct*

Defendant contends that prejudicial juror misconduct occurred at the penalty phase of the trial. His principal argument is that the trial court abused its discretion by declining to conduct an evidentiary hearing concerning the issue of juror misconduct. He also claims the trial court erred by denying his motion for new trial. He contends the error violated his rights under the Fifth, Sixth, and Seventh Amendments to the federal Constitution.

On November 5, 1995, following the jury's verdict of death, defendant submitted a motion for new trial based upon asserted prosecutorial misconduct. Attached to the motion were reports prepared by the defense investigator concerning postverdict interviews with several jurors. The trial court granted defense counsel's request for additional time in which to prepare a written motion for new trial based upon the allegation of juror misconduct.

On November 30, 1995, defense counsel filed the anticipated motion for new trial based upon his claim of juror misconduct. The motion alleged that "three separate claims of jury error must be addressed. [¶] First . . . did the jury discuss the opinion that death did not mean death, despite the court['s] instructions. Second, did the jury discuss the defendant['s] lack of remorse as a factor in aggravation. Third, did the jury discuss that 'life does not mean life.' Based upon these facts, it would appear that the jury discussed, and hence may have considered information that was improper." (Fns. omitted.) Attached to the motion were unsworn reports, prepared for defense counsel by the defense investigator, concerning interviews with several jurors. The motion was based exclusively on the three enumerated claims and concluded with a request for an evidentiary hearing after which, the motion asserted, "the parties can discuss [the] impact, if any of the record." The motion added that "since the error goes only to the penalty phase, if the court were to reduce the sentence to [life in prison without possibility of parole], the issue becomes [moot]."

In his opposition, filed December 11, 1995, the prosecutor contended that the unsworn hearsay reports prepared by the investigator were not a competent basis upon which to grant a motion for new trial and that, in any event, prejudicial juror misconduct had not been demonstrated.

More than one week later, the trial court conducted a hearing, advising counsel that it had considered with care defendant's motion and the People's opposition. The court inquired whether the parties wished to comment, and defense counsel responded that "the next logical step would be the submission of affidavits." Defense counsel claimed he had not submitted affidavits in support of the motion, because he understood from the court that it first would make a "threshold decision" concerning the truth of the allegations, in order to avoid "bothering the jury."

The prosecutor objected that the court had not suggested such a bifurcated proceeding. More significantly, the *court* emphatically denied it had done so. The court also denied having instructed defense counsel concerning how to approach the jurors.

The court concluded that the investigator's unsworn reports to defense counsel were not admissible to impeach the verdict. It added that, even if the investigator's hearsay reports were considered, defendant's allegations lacked merit. Finally, the court determined that the motion did not provide a sufficient basis for conducting an evidentiary hearing.

Defendant contends the trial court abused its discretion in declining to conduct an evidentiary hearing on the issue of asserted juror misconduct and in denying the motion for new trial. He renews the claims he made in the trial court based on statements allegedly made by Jurors R.A., S.L., and F.C. to the defense investigator.

According to defendant, Juror R.A. "recalled a discussion that a death sentence did not mean the defendant actually would be executed." As we read the record, when the investigator asked the juror whether she remembered anyone "discussing the topic that the Death Penalty does not necessarily mean that someone will be put to death, in light of the fact that there have been very few executions in recent history," R.A. responded that "she remembered that there was some opinion stated along that topic" and that "a few people commented on that topic." She added that "she did not think it influenced anyone's opinion nor their decision to vote for the death penalty."

Defendant claims Juror S.L.'s misconduct appears from her comment to the defense investigator that " 'to be honest, if we thought he would actually get death, we probably wouldn't put him to death.' "[20]

---

[20] According to the defense investigator's report attached to the motion, when Juror S.L. was asked what caused her to decide on a death verdict, she "began immediately by saying that in her opinion, 'to be honest, if we thought he would actually get death, we probably wouldn't put him to death. There have been only two in the last 28 years.' . . . She explained that it was her opinion that there was little likelihood that he would actually get the death penalty . . . ."

Defendant claims that Juror F.C.'s misconduct is evident because, according to defendant, she informed the investigator that "she had relayed to other jurors that she had 'worked for a lawyer in the Fresno courthouse' and had seen many people get sentenced to life without possibility of parole, but nonetheless be released from prison." The record, however, reflects the circumstance that F.C. told the *investigator* about her work experience. The investigator's report does not relate that F.C. stated she conveyed her supposed work experience—which occurred between 1973 and 1974, more than 20 years prior to the trial and prior to the enactment of the current death penalty statute—to other jurors as the source of her belief that persons sentenced to life in prison without parole may be released from prison.[21] According to the investigator, F.C. also stated that "the jurors felt that their concerns about his getting out of prison were not considered to be reasons to give the death penalty." She informed the investigator that she told other jurors who wondered whether a death sentence would be carried out that the speculation was not appropriate and that "they should consider the death penalty as something that for all their knowledge they might give a verdict out and he might be executed the next week."[22]

When questioned further concerning her opinion that it was unlikely defendant would be executed, "she reaffirmed that [it] was her opinion only." When asked whether other jurors "felt the same way or had used the same reasoning," she responded "it was her opinion that they may have felt somewhat similar to her in that a death penalty does not necessarily mean that he would actually be executed."

[21] The defense investigator's account of Juror F.C.'s statement reflects that, when asked the "main factors" she considered in arriving at the verdict, she mentioned various aspects of the evidence, adding that the jury "felt that there was a likelihood that the defendant would 'do it again.' " According to the defense investigator, F.C. informed him that "she worked for a lawyer in the Fresno courthouse and said that she had seen many people get sentenced to life without possibility of parole and in fact eventually get out of prison. [¶] She stated that she . . . did not want to see this defendant get out of prison. She said that all of the jurors were afraid that he would get out because of his young age and she said that she knew of three instances where people had gotten life without parole and had actually gotten out of prison. [¶] She said that there were several of the jurors who similarly commented that they had heard of it happening. She believes that there were at least three other jurors who had heard of cases where people had been given life, but were actually released from prison earlier." She added that "[s]ome of the jurors said that if they gave [defendant] the death penalty, it was possible that he would never get executed, but it would certainly be harder for him to get out of jail and certainly a harder punishment by being sentenced to death and incarcerated," but "she stated that she told the jurors that that was not appropriate to consider and that they should disregard such activities and they should consider the death penalty as something that for all their knowledge they might [return] a verdict . . . and he might be executed the next week."

[22] In his appellate briefs, defendant refers to a number of other alleged instances of juror misconduct that he claims were disclosed by the investigator's reports and should have been the basis for a hearing or a new trial. The People respond that defendant did not raise these concerns in the trial court in connection with his motion for new trial or his request for an evidentiary hearing, and therefore the additional claims of misconduct should be forfeited on appeal. We agree that failure to raise the issue of juror misconduct and seek relief from the court on that basis results in a forfeiture of the issue on appeal. (See *People v. Stanley, supra,* 39

■ The trial court is vested with broad discretion to act upon a motion for new trial. (See *People v. Ault* (2004) 33 Cal.4th 1250, 1260 [17 Cal.Rptr.3d 302, 95 P.3d 523].) When the motion is based upon juror misconduct, the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but must exercise its independent judgment to determine whether any misconduct was prejudicial. (*People v. Tafoya* (2007) 42 Cal.4th 147, 192 [64 Cal.Rptr.3d 163, 164 P.3d 590]; see also *People v. Ault, supra,* 33 Cal.4th at pp. 1263–1265.) A juror's receipt or discussion of evidence not submitted at trial constitutes misconduct. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 650 [21 Cal.Rptr.3d 612, 101 P.3d 509].) Juror misconduct raises a rebuttable presumption of prejudice; a trial court presented with competent evidence of juror misconduct must consider whether the evidence suggests a substantial likelihood that one or more jurors were biased by the misconduct. (*People v. Tafoya, supra,* 42 Cal.4th at p. 192.)

■ The trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct. (*People v. Avila* (2006) 38 Cal.4th 491, 604 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) "Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing . . . should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.[23] Even upon such a

---

Cal.4th at p. 950 [failure to object to juror misconduct and request mistrial]; *People v. Holloway* (2004) 33 Cal.4th 96, 124 [14 Cal.Rptr.3d 212, 91 P.3d 164].) The circumstance that defendant raised some juror misconduct claims in his motion for new trial does not serve to preserve other bases for his claim on appeal. (*People v. Masotti* (2008) 163 Cal.App.4th 504, 508 [77 Cal.Rptr.3d 483].)

[23] Defendant suggests that this standard—that the defense should make a prima facie showing of a "strong possibility" of prejudicial misconduct—"*may* be unreasonably elevated" and inconsistent with federal constitutional law. (Italics added.) He does not expand upon this assertion or supply persuasive authority. We rejected a related contention in *People v. Loker* (2008) 44 Cal.4th 691, 747 [80 Cal.Rptr.3d 630, 188 P.3d 580] (the defendant claimed the California rule—calling for setting aside the verdict for juror misconduct only if "there appears to be a substantial likelihood of juror bias"—was inconsistent with federal constitutional law). We also note the discussion and standard enunciated by the United States Court of Appeals for the Second Circuit: " '[C]ourts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.' [Citation.] 'This is to avoid harassment of jurors, inhibition of deliberation in the jury room, a deluge of post-verdict applications mostly without merit, . . . an increase in opportunities for jury tampering . . . [and] to prevent jury verdicts from being made more uncertain.' [Citation.] As we explained . . . , a trial court is required to hold a posttrial juror interrogation only when *reasonable grounds for investigation exist.* [Citation.] *Reasonable grounds are present when there is 'clear,' 'strong' and 'incontrovertible' evidence.*" (*U.S. v. Rosario* (2d Cir. 1997) 111 F.3d 293, 298–299, italics added; see *U.S. v. Angulo* (9th Cir.

showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' [Citations.]" *(People v. Avila, supra,* 38 Cal.4th at p. 604.) The trial court's decision whether to conduct an evidentiary hearing on the issue of juror misconduct will be reversed only if the defendant can demonstrate an abuse of discretion. *(Ibid.; People v. Carter, supra,* 30 Cal.4th at p. 1216; *People v. Jones, supra,* 17 Cal.4th at p. 317; *People v. Williams* (1997) 16 Cal.4th 635, 686 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Cox* (1991) 53 Cal.3d 618, 694 [280 Cal.Rptr. 692, 809 P.2d 351], disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

Contrary to defendant's assertion, ordinarily a trial court does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay. *(People v. Hayes* (1999) 21 Cal.4th 1211, 1256 [91 Cal.Rptr.2d 211, 989 P.2d 645] ["Normally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct."]; see also *People v. Avila, supra,* 38 Cal.4th at p. 605; *People v. Carter, supra,* 30 Cal.4th at p. 1217.) Moreover, a trial court does not abuse its discretion in denying a motion for new trial based upon juror misconduct when the evidence in support constitutes unsworn hearsay. *(People v. Cox, supra,* 53 Cal.3d at p. 697 [the defense

---

1993) 4 F.3d 843, 847 ["in determining whether a hearing [under *Remmer v. United States* (1954) 347 U.S. 227 [98 L.Ed. 654, 74 S.Ct. 450]] must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source"].)

We note that the United States Court of Appeals for the Ninth Circuit has held that the trial court has broad discretion in this context. "[I]t is within the trial court's discretion to determine whether and when to hold an evidentiary hearing on [juror misconduct] allegations. If the judge orders an investigative hearing, it is within his discretion to determine its extent and nature. [Citations.] As a matter of common sense, a trial judge in making these decisions will necessarily be directed by the content of the allegations, including the seriousness of the alleged misconduct or bias, and the credibility of the source." *(U.S. v. Hendrix* (9th Cir. 1977) 549 F.2d 1225, 1227–1228, fn. omitted; see also *U.S. v. Shryock* (9th Cir. 2003) 342 F.3d 948, 973.) Presumably, a trial court would have discretion to view an unsworn report by a defense investigator as lacking in sufficient credibility. A report that falls short of asserting that the juror said he or she had *conveyed* information to other jurors based upon his or her work experience may be considered lacking in seriousness. Federal court decisions recognize the breadth of the trial court's discretion in such matters. "The decision to investigate jury misconduct allegations rests within the sound discretion of the [trial] court." *(U.S. v. Rosario, supra,* 111 F.3d at p. 299 [also referring to the court's "very broad discretion"]; see *U.S. v. Shryock, supra,* 342 F.3d at p. 973.) In a case in which defense counsel presented "unverified conjecture" prior to the verdict that a juror might be biased because of a relationship with government witnesses, "[i]n the absence of a showing which, on its face, would disqualify [the] juror . . . , the court act[s] properly in taking into account . . . the failure of counsel to provide an affidavit . . ." detailing evidence of misconduct. *(U.S. v. Bradshaw* (10th Cir. 1986) 787 F.2d 1385, 1390.) The evidence proffered by the defense in the present case was not such that the court's failure to conduct an evidentiary hearing constituted error under either the state or federal standards.

presented the unsworn statement of a juror and an affidavit by an investigator recounting the juror's statement to him, but the evidence was not competent, and this court's decision in *People v. Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260] is not to the contrary]; *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221] ["The sole evidence of the alleged misconduct was the declaration of a defense investigator that purports to relate a conversation with [a] juror. It is settled, however, that 'a jury verdict may not be impeached by hearsay affidavits.' "].)

Defendant does not offer a persuasive basis for deviating from the general rule governing unsworn hearsay as a basis for a motion for new trial or for a request to hold an evidentiary hearing on an allegation of juror misconduct. The trial court afforded defense counsel approximately one month to amend or supplement his original motion for new trial to include the juror misconduct claim. We accept as true the trial court's assertion that it did not suggest to defense counsel in off-the-record conversations that counsel was not obliged to support the motion for new trial with affidavits or declarations from jurors. Defendant does not point to any discussion on the record in which the court made such a suggestion. The prosecution's written opposition to the motion—filed almost two weeks prior to the hearing on the motion— relied in part upon the failure of defense counsel to submit juror affidavits, citing governing decisions by this court, yet defense counsel did not respond by submitting such affidavits prior to or at the hearing. Defense counsel evidently had full access to the jurors, and there is no indication that the defense could not have obtained juror affidavits. We note, too, that the defense motion was not even supported by a *declaration* from the investigator, but merely by his *unsworn* reports to defense counsel. Defense counsel did not seek to call the investigator to testify. In addition, defense counsel did not request a continuance for the purpose of securing juror affidavits.

Defendant contends the investigator's reports did not constitute hearsay, because they were not offered for their truth. In other words, according to defendant, it was immaterial whether the jurors' statements to the investigator were true. Rather, according to defendant, they constituted objective evidence that improper matters had been discussed during deliberations.

We are not persuaded. The investigator's report itself interposed a level of hearsay (see, e.g., *People v. Williams, supra*, 45 Cal.3d at p. 1318), and the investigator's assertions concerning juror statements were probative only if the investigator's assertions—that the jurors had made the comments—were true.

Finally, we disagree with defendant that his motion alleged such serious misconduct that the court abused its discretion by declining to order an

evidentiary hearing. The purported statements by jurors concerning the effect on them of the possibility of defendant's release from prison and the probability of an execution constituted indications of juror mental processes that are made inadmissible by Evidence Code section 1150, subdivision (a). (See *People v. Steele* (2002) 27 Cal.4th 1230, 1261 [120 Cal.Rptr.2d 432, 47 P.3d 225] [statements of jurors "regarding their understanding of the meaning of a life sentence and what they would have done had they believed differently come squarely within the prohibition against impeaching a verdict with evidence of the juror's mental processes"].) To the extent the comments reflected speculation concerning punishment, in *People v. Steele, supra*, 27 Cal.4th 1230, and other decisions, we have accepted similar discussions as an inevitable feature of the jury system. (See *id.* at pp. 1264–1265; see also *People v. Schmeck* (2005) 37 Cal.4th 240, 307 [33 Cal.Rptr.3d 397, 118 P.3d 451] [no misconduct in jury's discussion of a television talk show program concerning a prisoner who was released although he had been sentenced to life in prison without the possibility of parole, or in jurors' speculation concerning the defendant's possible release]; *People v. Riel, supra*, 22 Cal.4th at p. 1219 [no misconduct when a juror who had been employed at the county jail expressed the opinion that the court would reduce a death sentence to life imprisonment]; *People v. Pride, supra*, 3 Cal.4th at pp. 267–268 [jurors discussed a recent escape from Vacaville prison, and a juror known to have served as an employee at that prison suggested that a life prisoner has a far greater opportunity to escape than a prisoner condemned to death]; *People v. Cox, supra*, 53 Cal.3d at p. 696 [juror who referred to former Chief Justice Rose Bird, and asserted that the death penalty had not been carried out since the 1960's, did not commit misconduct].)

 With respect to defendant's claim that Juror F.C. committed misconduct by informing the jury that she had knowledge concerning the release of prisoners based upon her work with a lawyer in the Fresno County courthouse, the investigator's reports did not state that Juror F.C. said she had *conveyed* outside information *to other jurors* in the form of her asserted "experience" in the Fresno County courts. (See *People v. Riel, supra*, 22 Cal.4th at p. 1219 [a juror who suggested the court would commute a death sentence had been employed at a county jail, but there was no indication she "did anything but express a personal opinion" to other jurors].) The circumstance that the juror herself may have considered this asserted experience goes in large part to her internal thought processes and, in any event, does not constitute misconduct. (*Ibid.* [" 'Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.' "].)

Under all the circumstances, the trial court did not abuse its discretion in concluding that the investigator's unsworn reports did not constitute a basis for holding an evidentiary hearing. For the same reasons, the court did not err

in denying the motion for a new trial. No error under state law or federal constitutional law occurred.

### 9. Challenges to California's death penalty scheme

Contrary to defendant's claim based upon the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1141 [81 Cal.Rptr.3d 614, 189 P.3d 880]; *People v. Cruz, supra*, 44 Cal.4th at p. 680; *People v. Morgan* (2007) 42 Cal.4th 593, 626 [67 Cal.Rptr.3d 753, 170 P.3d 129]; see also *People v. Gurule* (2002) 28 Cal.4th 557, 663 [123 Cal.Rptr.2d 345, 51 P.3d 224] [rejecting an overbreadth claim based upon asserted overinclusiveness of the felony-murder special circumstance].)

As in prior decisions, we reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*People v. Williams, supra*, 43 Cal.4th at p. 648; *People v. Morgan, supra*, 42 Cal.4th at p. 626.) The statute does not create a presumption in favor of death (*People v. Salcido, supra*, 44 Cal.4th at p. 163), nor does it permit an unconstitutional aggregation of aggravating factors (*People v. Seaton* (2001) 26 Cal.4th 598, 690–691 [110 Cal.Rptr.2d 441, 28 P.3d 175]).

The absence of intercase proportionality review does not violate the federal or state Constitutions. (*People v. Crittenden* (1994) 9 Cal.4th 83, 156–157 [36 Cal.Rptr.2d 474, 885 P.2d 887] [rejecting claims based upon due process and equal protection guarantees, the prohibition on cruel or unusual punishment, and § 1170, subd. (f)]; see also *People v. Cruz, supra*, 44 Cal.4th at p. 681.)

"[N]othing in the federal Constitution requires the penalty phase jury to (1) make written findings of the factors it finds in aggravation and mitigation [citations]; (2) agree unanimously that a particular aggravating circumstance exists [citations]; (3) find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence [citations]; (4) find that aggravation outweighs mitigation beyond a reasonable doubt [citations]; or (5) conclude beyond a reasonable doubt that death is the appropriate penalty. [Citations]." (*People v. Williams, supra*, 43 Cal.4th at pp. 648–649.) The application of these principles to penalty determinations does not violate equal protection principles established by the Fourteenth Amendment to the United States Constitution. (*People v. Cruz, supra*, 44 Cal.4th at p. 681 ["capital defendants are not similarly situated to noncapital defendants, [so] the death penalty law does not violate equal protection by denying capital

defendants certain procedural rights given to noncapital defendants"]; *People v. Valencia* (2008) 43 Cal.4th 268, 311 [74 Cal.Rptr.3d 605, 180 P.3d 351].)

"[E]xcept for prior violent crimes evidence and prior felony convictions under section 190.3, factors (b) and (c), the court need not instruct regarding a burden of proof . . . ." (*People v. Cruz, supra,* 44 Cal.4th at p. 681.) Because " '[u]nlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 589 [36 Cal.Rptr.3d 340, 123 P.3d 614]), it is sufficient that the jury was instructed that " '[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole' " (*ibid.*). Moreover, "[t]he United States Supreme Court decisions rendered in *Ring v. Arizona*[, *supra,*] 536 U.S. 584 and *Apprendi v. New Jersey*[, *supra,*] 530 U.S. 466 do not compel a different conclusion." (*People v. Manriquez, supra,* 37 Cal.4th at p. 589; see also *People v. Williams, supra,* 43 Cal.4th at p. 649 [the high court's decision in *Cunningham v. California, supra,* 549 U.S. 270, does not compel a different result].) Under the principles recited above and contrary to defendant's claim, Evidence Code section 520, establishing that a party "claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue," does not apply to the normative decision on penalty that is performed by the trier of fact at the penalty phase of a capital trial.

### 10. *CALJIC No. 8.85*

Defendant contends that asserted defects in pattern instruction CALJIC No. 8.85 prejudicially affect the jury's understanding of its weighing function, in violation of the prohibition against cruel or unusual punishment contained in the Eighth Amendment to the United States Constitution and the Fourteenth Amendment's guarantee of equal protection of the laws, as well as parallel state constitutional provisions. We decline to reconsider prior decisions holding that the instruction "is not unconstitutionally vague" (*People v. Farnam* (2002) 28 Cal.4th 107, 192 [121 Cal.Rptr.2d 106, 47 P.3d 988]; *People v. Lucero* (2000) 23 Cal.4th 692, 727 [97 Cal.Rptr.2d 871, 3 P.3d 248]); that the instruction is not flawed for its failure to identify which facts may be considered aggravating and which may be considered mitigating (*People v. Cruz, supra,* 44 Cal.4th at p. 681; *People v. Valencia, supra,* 43 Cal.4th at p. 309); that the trial court is not compelled to delete assertedly inapplicable factors from the instruction (*People v. Farnam, supra,* 28 Cal.4th at pp. 191–192); that the instruction does not " 'inherently encourage the double counting of aggravating factors' " (*People v. Ayala* (2000) 24 Cal.4th

243, 289 [99 Cal.Rptr.2d 532, 6 P.3d 193]); and that the trial court is not compelled to instruct the jury on the court's own motion not to consider the same facts twice in aggravation, in the absence of any misleading argument by the prosecutor (*ibid.*).

Defendant contends the instruction failed to guide the jury in its consideration of "[t]he presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (CALJIC No. 8.85.) This claim lacks merit because pattern instructions adequately direct the jury in their consideration of unadjudicated criminal activity. (*People v. Monterroso* (2004) 34 Cal.4th 743, 793 [22 Cal.Rptr.3d 1, 101 P.3d 956].) We are not persuaded by defendant's added claim that the instruction, given in the terms of the statute, permitted the jury to consider unreliable evidence of defendant's possession of a loaded firearm, an assertedly nonviolent act. (See *ibid.*) Moreover, the high court has determined that section 190.3, factor (b), the language of which is reproduced in the pattern instruction, is not unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 977–980 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Lucero, supra*, 23 Cal.4th at p. 727.) This court has rejected claims that the consideration of prior unadjudicated crimes denies due process, equal protection, or the right to a reliable sentencing procedure. (*People v. Cain, supra*, 10 Cal.4th at pp. 69–70.) The terms "force" and "violence" are readily understandable and do not require explanation. (*People v. Dunkle* (2005) 36 Cal.4th 861, 922 [32 Cal.Rptr.3d 23, 116 P.3d 494], disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

■ CALJIC No. 8.85 instructs the jury in the terms of section 190.3, factors (d) ("extreme mental or emotional disturbance") and (h) ("mental disease or defect or the effects of intoxication"). Defendant contends the giving of this instruction resulted in a violation of his rights under the state and federal Constitutions because the jury was not instructed that these factors properly may be considered solely in mitigation. Defendant refers to anecdotal evidence and a 1994 academic study suggesting that public attitudes toward these factors may cause them to be considered in aggravation.

It is unnecessary to instruct the jury that section 190.3, factors (d) and (h) may be considered solely in mitigation. (*People v. Page* (2008) 44 Cal.4th 1, 61 [79 Cal.Rptr.3d 4, 186 P.3d 395]; *People v. Lucero, supra*, 23 Cal.4th at p. 728.) The pattern instruction does not suggest that the absence of a mitigating factor should be considered in aggravation. (*People v. Page, supra*,

44 Cal.4th at p. 61.) Speaking of the same academic study cited by defendant, this court observed that " '[w]e presume that jurors comprehend and accept the court's directions.' [Citation.] The presumption that the jurors in this case understood and followed the mitigation instruction supplied to them is not rebutted by empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross examination." (*People v. Welch, supra*, 20 Cal.4th at p. 773.)

### 11. *CALJIC No. 8.88*

Defendant challenges CALJIC No. 8.88, an instruction that concerns the jury's function in weighing the circumstances in aggravation and mitigation and in deciding the appropriate penalty. Defendant contends that this instruction is "vague and imprecise, fail[s] to adequately describe the weighing process the jury must apply in capital cases, and deprived [defendant] of the individualized consideration the Eighth Amendment requires." We have held, however, that the pattern instruction "properly instructs the jury on its sentencing discretion and the nature of its deliberative process." (*People v. Valencia, supra*, 43 Cal.4th at p. 310.) Defendant claims the instruction was misleading and improperly weighted the scale in favor of death, because it permitted the jury to impose the death penalty even if it found the mitigating circumstances outweighed the aggravating circumstances, so long as it found "substantial" aggravating circumstances. This contention lacks merit. (*People v. Salcido, supra*, 44 Cal.4th at p. 163; *People v. Page, supra*, 44 Cal.4th at p. 57.)

Defendant contends the instruction failed to provide an accurate description of the jury's weighing function. He claims the instruction called for a quantitative, mechanical weighing process rather than a qualitative evaluation of the applicable factors, and that it failed to convey that a single mitigating factor may warrant a sentence less than death. We do not agree. The instruction itself informs the jury that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate . . . ." (CALJIC No. 8.88; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1161 [124 Cal.Rptr.2d 373, 52 P.3d 572] [the instruction "properly describes the weighing process as ' "merely a metaphor for the juror's personal determination that death is the appropriate penalty under all of the circumstances" ' "]; see also *People v. Page, supra*, 44 Cal.4th at p. 56.) The court was not obliged to instruct the jury that a single mitigating circumstance could outweigh multiple aggravating circumstances. (*People v. Salcido, supra*, 44 Cal.4th at pp. 162–163.)

Contrary to defendant's claim, the instruction is not defective because of an asserted failure to inform the jury which circumstances warrant the penalty of life in prison without the possibility of parole. The instruction adequately conveys that unless substantial aggravating factors outweigh mitigating circumstances, a sentence of death is not appropriate. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1181 [113 Cal.Rptr.2d 827, 34 P.3d 937].) The defendant is not under an obligation to demonstrate that mitigating circumstances "warrant" the lesser penalty. The instruction is not defective for its asserted failure to describe or define the penalty of life in prison without the possibility of parole. (*People v. Zamudio, supra*, 43 Cal.4th at p. 372.) Defendant's reliance upon *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263] is unavailing. (*People v. Harris, supra*, 43 Cal.4th at p. 1317 [In *Shafer*, the court explained that "the South Carolina instructions were defective because they failed to inform the jury of the defendant's parole eligibility status," whereas the California instructions "explicitly informed the jury that there would be no possibility of parole"].)[24]

Defendant claims the instruction fails to inform the jury concerning the full scope of evidence that may be considered mitigating, asserting that the instruction implies that the sole pertinent circumstance in mitigation must concern the capital crime. As noted, however, we have concluded the instruction "properly instructs the jury on its sentencing discretion and the nature of its deliberative process" (*People v. Valencia, supra*, 43 Cal.4th at p. 310), and we presume jurors understand the instructions notwithstanding "empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross examination" (*People v. Welch, supra*, 20 Cal.4th at p. 773).

### 12. *Presumption against the death penalty*

Defendant contends the court's failure to instruct that the jury should entertain a presumption in favor of a life sentence violated his federal constitutional right to due process of law under the Fifth and Fourteenth Amendments, his Eighth Amendment rights to a reliable penalty determination and to be free of cruel and unusual punishment, and his right to equal protection under the Fourteenth Amendment. Contrary to defendant's claim, he was not entitled to an instruction informing the jury that a presumption exists in favor of a sentence less than death. (*People v. Mungia, supra*, 44 Cal.4th at p. 1142; *People v. Zamudio, supra*, 43 Cal.4th at p. 373.)

---

[24] As explained *ante*, we decline to consider the unsworn juror affidavits claimed by defendant to suggest jurors believed that capital-offense defendants serving life terms without possibility of parole actually may be released. (See *ante*, at pp. 810–811.)

### 13. *Proportionality*

Defendant contends the penalty of death is disproportionate to his individual culpability. He claims a violation of article I, section 17 of the California Constitution and the prohibition against cruel and unusual punishment contained in the state and federal Constitutions.

 Defendant's claim that the punishment is disproportionate to his culpability requires us to consider " 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' " (*People v. Dillon, supra,* 34 Cal.3d at p. 479.) We inquire "whether the punishment is grossly disproportionate to the defendant's individual culpability . . . ." (*Ibid.*) " '[W]e examine the circumstances of the offense, including its motive, the extent of defendant's involvement, the manner in which the crime was committed, the consequences of defendant's acts, and defendant's personal characteristics including age, prior criminality, and mental capabilities.' " (*People v. Tafoya, supra,* 42 Cal.4th at p. 198.)

Defendant draws our attention to his youth at the time of the crime. He was 20 years of age when he committed the murder.[25] He contends he acted impulsively and lacked the intent to kill the murder victim. He refers to the jury's verdict finding him guilty of the attempted murder of Bernice Clark but without premeditation. He refers also to evidence suggesting he was intoxicated at the time of the crime. He asserts he had "virtually no criminal history," claiming the evidence of the prior firearm offense demonstrated he did not act violently or resist arrest, and that the prior offense constituted a misdemeanor rather than a felony.

 We acknowledge that defendant's youth stands in his favor. His prior record, although denominated a misdemeanor, suggests a disregard for safe and appropriate use of firearms that, even under defendant's account, is evident in the present crime, as well. Many of the other circumstances upon which defendant relies are common to felony-murder cases, and yet it does not constitute a violation of the Eighth Amendment to sentence a person to death who personally kills during an enumerated felony but who does not premeditate—or even lacks intent to kill. (*People v. Harris, supra,* 43 Cal.4th at p. 1322; *People v. Anderson* (1987) 43 Cal.3d 1104, 1140, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) Defendant has requested that we conclude he did not act with premeditation, relying upon the jury's verdict on the attempted murder charge. If we consider the jury's verdict on the latter charge in connection with the capital offense, it also causes us to conclude that

---

[25] Defendant's briefing claims he was 19 years of age at the time of the crime, but the record demonstrates that defendant was born on December 23, 1972. The crime occurred in July 1993, when defendant was 20 years of age.

defendant actually *did* form the intent to kill before he discharged his weapon, because intent to kill is an element of the offense of attempted murder. Thus, defendant's claim that the murder constituted an entirely accidental killing is not persuasive—particularly when we consider evidence suggesting he shot Bernice Clark because she had recognized him. There was ample evidence demonstrating that defendant planned the robbery and armed himself with a loaded weapon for the purpose of confronting an elderly woman, as the trial court found when it considered the proportionality question in connection with the automatic motion for reconsideration of the jury's verdict (§ 190.4, subd. (e)). The court also pointed to evidence suggesting that defendant was aware Lance Clark frequently accompanied his grandmother on her rounds and that, indeed, defendant must have observed Lance in the automobile when he observed Bernice drive to the rear of the apartment building. The claim that defendant may have been intoxicated at the time of the capital offense does not diminish the degree of danger defendant evidently presents to society, nor does it diminish his culpability in robbing and shooting an elderly woman who was known to lend money to her tenants. Finally, none of defendant's claims on appeal counters the nature and tragic result of the crime itself.

 Defendant contends we should rely upon section 1181, subdivision 7 and section 1260, provisions that govern motions for new trial and the authority of appellate courts to modify judgments, as bases for exercising our own authority to reduce the capital sentence. Prior decisions establish that these provisions do not confer authority on this court to "substitute its judgment as to choice of penalty for that of the trier of fact, and . . . the court may not reduce a capital defendant's sentence from death to life imprisonment simply because it disagrees with the jury's penalty determination." (*People v. Hines, supra*, 15 Cal.4th at p. 1080; see also *People v. Steele, supra*, 27 Cal.4th at pp. 1268–1269.) Accordingly, we reject defendant's claim that the statutory provisions constitute a "procedural entitlement that is protected by the due process clause." Our conclusion does not impair defendant's right to meaningful appellate review within the meaning of the Eighth Amendment or the due process clause of the United States Constitution; defendant's rights in this regard are confined to and satisfied by our having considered, and rejected, his assertion that his sentence of death is disproportionate to his individual culpability.

Contrary to defendant's claim, we are not required also to conduct intercase proportionality review. (*People v. Mungia, supra*, 44 Cal.4th at p. 1142; see also *People v. Harris, supra*, 43 Cal.4th at pp. 1322–1323 [questioning the defendant's assertion that we have "categorically forbidden such review"].)

### 14. *Prosecutorial discretion*

Contrary to defendant's claim, the California death penalty provisions do not violate the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by virtue of the assertedly "unbridled" charging discretion these provisions vest in prosecutors. (*People v. Prince, supra*, 40 Cal.4th at p. 1298; *People v. Crittenden, supra*, 9 Cal.4th at p. 152.)

### 15. *Method of execution*

Defendant's challenge to California's method of execution, and to the administrative procedure followed in adopting it, is not cognizable on appeal, " 'because alleged imperfections in the method of execution do not affect the validity of the death judgment itself. Defendant's attack on illegalities in the execution process that may or may not exist when his death sentence is carried out are premature.' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 536 [61 Cal.Rptr.3d 526, 161 P.3d 58]; see also *Baze v. Rees* (2008) 553 U.S. 35 [170 L.Ed.2d 420, 128 S.Ct. 1520] [Kentucky's three-drug protocol for lethal injection, a protocol that is identical to California's, does not violate the Eight Amendment].)

### 16. *International law*

We have rejected the contention that California's death penalty statutes violate international law. (*People v. Cruz, supra*, 44 Cal.4th at p. 689; *People v. Geier* (2007) 41 Cal.4th 555, 620 [61 Cal.Rptr.3d 580, 161 P.3d 104].) Defendant argues that even if capital punishment itself is consistent with international norms, its asserted use as a "regular punishment for substantial numbers of crimes" is not. As noted above, however, the death penalty statutes adequately narrow the class of persons subject to the penalty of death under state and federal law. Imposition of that penalty in a manner consistent with state and federal law does not constitute a violation of international law. (*People v. Cruz, supra*, 44 Cal.4th at p. 689; *People v. Brown, supra*, 33 Cal.4th at p. 404.) Contrary to defendant's contention, the trial and postverdict proceedings in his case were conducted in a manner consistent with state and federal law.

### 17. *Cumulative prejudice*

Contrary to defendant's claim, the errors we have found or assumed are so insignificant in the context of the trial as a whole that there is no reasonable possibility that they affected the outcome of the proceedings, whether such errors are considered singly or cumulatively.

## III. CONCLUSION

For the foregoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 12, 2009. Moreno, J., and Corrigan, J., did not participate therein.